**UNITED STATES of America, Appellee,**

v.

**Alexander DANZEY and Warren Gore, Appellants.**

**Nos. 511, 514, Dockets 78–1342, 78–1343.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 8, 1979.

Decided March 19, 1979.

Certiorari Denied May 14, 1979.
See 99 S.Ct. 2179.

Barry Bassis, The Legal Aid Society, Federal Defender Services Unit, New York City, for appellant Danzey.

Peter J. Fabricant, Brooklyn, N. Y. (Peter A. Passalacqua, Brooklyn, N. Y., of counsel), for appellant Gore.

Thomas D. Sclafani, Asst. U. S. Atty. (Edward R. Korman, U. S. Atty. for the Eastern District of New York, Mary McGowan Davis, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for appellee.

Before KAUFMAN, Chief Judge, and SMITH and OAKES, Circuit Judges.

OAKES, Circuit Judge:

This appeal, like a number of others involving bank robbery charges, entails questions of similar act evidence and identification testimony. It also involves a severance issue. Appellants Alexander Danzey and Warren Gore were convicted in the United States District Court for the Eastern District of New York, Thomas C. Platt, Judge, following a jury verdict on two counts of bank robbery and armed bank robbery in violation of 18 U.S.C. §§ 2113(a) and (d), and 18 U.S.C. § 2. Danzey was sentenced to twenty-five years' imprisonment and Gore to twenty years' imprisonment for armed bank robbery; the conviction on the bank robbery count was merged into the armed bank robbery count at sentencing. Appellant Gore contends that he was unfairly prejudiced by the introduction of evidence that he had admitted to robbing fifteen other banks, using a modus operandi similar to the one utilized in the robbery for which he was convicted but which he did not admit. Appellant Danzey argues (1) that the trial court erroneously refused to suppress testimony about a photographic identification and subsequent in-court identification of him; (2) that the evidence against him was insufficient as a matter of law because the only testimony linking him to the crime was too full of inconsistencies to support the jury's verdict of guilty beyond a reasonable doubt; and (3) that he was denied his right to confrontation under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), because he

was not permitted a severance and his codefendant's admissions were insufficiently redacted. We affirm as to Gore and reverse and remand as to Danzey.

## THE BANK ROBBERY

The Community National Bank and Trust Co. is located at the corner of Clove Road and Niagara Street in Staten Island, New York. At about 9:30 a. m. on July 30, 1977, a young woman who was sitting in a car outside the bank waiting for her sister to transact business inside observed two men wearing ski masks and gloves getting out of a white car with a black vinyl top bearing New Jersey license plates. One man carried a bag and a gun while the other, who was "slumped over," wore sneakers and carried a bag. A third man sat in the driver's seat. The two masked men walked into the bank, remained inside about three minutes, rushed out, and re-entered the white car which then sped away from the bank. The young woman's sister, who was in the bank, was ordered to the floor several times by the shorter of the two men from whose voice she concluded that he was black; the man ultimately knocked her to her knees. She also observed the second masked man, the taller of the two, run into the bank, "hunched over like a monkey or an ape," vault the teller's counter carrying a bag, take the entire money trays from two of the tellers, and stuff the booty into a canvas bag. He revaulted the teller's counter and left with the shorter man. None of the bank employees or the two sisters could identify anyone as the bank robbers.

However, another young woman, Sylvia Csuros, a nineteen-year-old college student, had been studying in her mother's bedroom in their second floor apartment located only about two blocks from the bank. The corner apartment overlooked Grand and Dudley Avenues, quiet residential streets in Staten Island. Shortly after 9:00 a. m. on July 30, 1977, a bright and sunny morning, from a window facing Grand Avenue Csuros saw a large gold car followed closely by a smaller white car speed down Grand Ave-

nue and turn right onto Dudley. She left her mother's bedroom and went into the living room which faced both Grand and Dudley Avenues and with her view unobstructed observed the gold car park across the narrow street below the living room window and the white car park directly behind the gold car. She then saw a man emerge from the street side of the gold car carrying a brown paper bag. She watched him walk in the street back to the white car and either toss or pass the brown bag into the front seat of the white car, then return to the gold car. She then saw a taller man exit from the driver's side of the gold car. She described him as black and tall and said that he wore a wig, a bright orange shirt, and elevated shoes. The man walked along the sidewalk to the white car and got into the front seat of the white car on the driver's side, causing the original driver, whom Ms. Csuros never saw, to slide over to the passenger side. Ms. Csuros then saw the first man, who had tossed the brown bag into the front seat of the white car, return from the gold car to the white car and enter it by the rear door. The white car drove off, shortly after returned, and the occupants transferred back to the gold car and drove off at a high rate of speed.

These were the essential parts of Ms. Csuros's testimony, but, as will be seen, there was, at the very least, considerable confusion on her part.

According to Ms. Csuros's testimony at the suppression hearing, she had described the robbers to a special agent of the Federal Bureau of Investigation (FBI) on the day of the robbery as follows:

There was a short man with relatively light Negroid skin. And what he was wearing wasn't anything really noteworthy. And I didn't even see him that well because he was lighter. But I saw the other man much better because he was rather conspicuously dressed. He had on a bright orange shirt which immediately attracted my attention to him, and he was a very dark skinned man with very definite features and face.

Ms. Csuros expanded on this last characterization by describing this second man as having "a very long face . . . [a]nd his eyes were kind of bulging." She further indicated that the darker man was the taller of the two and that because of the difference between the coloration of the two men, "the contrast . . . was pretty much night and day."

About a month and a half after the bank robbery, the agent showed her two sets of photographic arrays, each containing six "mug shots." According to the agent's testimony at trial, he told Ms. Csuros, in order "to refresh her recollection as far as number one and number two," that "[n]umber one was the fellow with the brown bag" and "[n]umber two was the fellow on the other side driving." After studying the first set of photographs, Ms. Csuros selected appellant Danzey's picture as "number one," "the individual with the brown bag," whom the agent, on the basis of Ms. Csuros's statement to him on the day of the robbery, further identified in his testimony as the shorter and lighter skinned man. From the second set of photographs, Ms. Csuros selected one Richard Irving, not a codefendant and not tried for this robbery. The agent testified that Ms. Csuros had commented on his facial features when she identified his picture. The agent allowed at trial that this second man would be the taller and darker one.

Almost a year after the robbery, Ms. Csuros received a telephone call from an FBI agent who asked her to come to the United States Attorney's office because "the men who were involved in the robbery have been apprehended." The prosecutor then showed her the same two sets of photographic arrays that the special agent had shown her, and she immediately recognized them as the same. He instructed her "to see if [she] could still pick out the same person as [she] picked out the last time, and she did so quite easily. Counsel for Danzey argues that this second procedure was unnecessarily suggestive and tainted her subsequent in-court identification. Appellant Danzey, it may be noted, had been in custo-

dy for some time, and the Government could have conducted a lineup. *See United States v. Fernandez,* 456 F.2d 638, 641 n. 1 (2d Cir. 1972); *see also Simmons v. United States,* 390 U.S. 377, 386 n. 6, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). But appellant does not and could not successfully contend that the presentation of photographs after indictment and without the presence of counsel was per se illegal.[1]

At the pretrial suppression hearing Ms. Csuros stated that her identification of the two men had been "tentative" but that she was more certain about the second identification, that is, the taller man, whom she now knew to be appellant Danzey. At trial, however, where Ms. Csuros was permitted to make an in-court identification of appellant Danzey over his counsel's objection, she testified that the man carrying the bag was short and that he was the one with bulging eyes. She then identified appellant Danzey as one of the robbers and stated that she was "reasonably certain" that he was "the first man, that being the shorter of the two." (Danzey is 5' 7".) But she now identified the first man as the darker man. After she reviewed the officer's memorandum of her description on the day of the robbery, she once again stated that the second man was darker and taller. She repeated that description later in her testimony and finally characterized "number one" as the "day" of the "day and night" color contrast. She then identified appellant Danzey as "number one" and as the lighter skinned man.

Ms. Csuros also testified that she had had a "better look at" the first man, having viewed him for approximately one minute and the second man for twenty or twenty-five seconds or only about half as long. The second man drew her attention, how-

ever, because he was wearing a bright orange shirt, although not because of any distinctive facial characteristics. Again she said that she had been more certain of the second identification.

As to the inconsistencies in her testimony at the suppression hearing and at trial, that is, the identification of appellant Danzey first as the taller man and then as the shorter,[2] the attribution of the bulging eyes first to the second man and then to the first, and the description of the darker man first as the taller one, then the shorter one, and then the taller one again, Ms. Csuros stated that she had had more time in the week since the pretrial hearing to recall what had happened the year before and that she had given "a lot of thought . . . to this whole matter." She admitted, however, to having met on several occasions during that week with the prosecutor who had presented her with sample questions that she might be asked, including questions about the physical descriptions of the two men. She also stated that the lighting in some of the pictures distorted the skin color which might thus be inaccurately represented on the photographs. Finally, she stated that the confusion might be the result of her remembering the faces but not quite remembering which body went with the face because a long time had passed since the robbery.

## SIMILAR ACTS EVIDENCE

■ Appellant Gore's only argument is that the Government's introduction into evidence of his admissions of fifteen similar criminal acts, consisting of other bank robberies, was highly prejudicial and deprived him of a fair trial. This evidence was admitted under Fed.R.Evid. 404(b) to show identity.[3] The trial court found on the ba-

---

1. *See United States v. Mojica,* 442 F.2d 920, 921 (2d Cir. 1971); *United States v. Fitzpatrick,* 437 F.2d 19, 25–26 (2d Cir. 1970).

2. The identifications of Danzey were in the following order: at both photo spreads, Ms. Csuros identified Danzey as the shorter man; at the suppression hearing, she stated that she

now knew the taller man to be Danzey; at trial, she twice identified Danzey as the shorter man.

3. Fed.R.Evid. 404(b) provides:
   *Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible

sis of the Government's offer of proof that appellant Gore's similar crimes had such a distinctive modus operandi that the evidence could be so admitted. *See United States v. Cavallino,* 498 F.2d 1200, 1206–07 (5th Cir. 1974); *United States v. Sidman,* 470 F.2d 1158, 1166 (9th Cir. 1972), *cert. denied,* 409 U.S. 1127, 93 S.Ct. 948, 35 L.Ed.2d 260 (1973); *United States v. McCray,* 140 U.S.App.D.C. 67, 69, 433 F.2d 1173, 1175 (1970) (per curiam); McCormick's Handbook on the Law of Evidence § 190, at 449, 451 (E. Cleary ed. 1972); *cf. United States v. Gubelman,* 571 F.2d 1252, 1255 & n. 12 (2d Cir.), *cert. denied,* 436 U.S. 948, 98 S.Ct. 2853, 56 L.Ed.2d 790 (1978) (proof of identity by other similar acts not limited to unique scheme or pattern).

Appellant Gore's contention that the evidence was more prejudicial than it was probative borders on the frivolous. Appellant concedes, as he must, that the evidence was relevant. By Gore's own statements he had a modus operandi, practically a signature, to his robberies; according to the testimony at trial of the FBI agent to whom appellant made the statements, "He said that he had a certain trademark in robbing a bank." Cars would be stolen for a bank robbery late the night before or early on the morning of the robbery. If the "getaway" car was dark, the "switch" car would be light and vice versa. The cars would be early 1970's Fords, the easiest to steal. They would be stolen by pulling out the ignition with a "dent puller." The getaway car, used at the bank, was always a stolen car, while the switch car was sometimes legitimate. The robberies occurred early in the morning between 9:00 and 11:00. Gore said that he always wore a ski mask, gloves, and two sets of clothes, one of which he would remove after leaving the bank. Three or four men were always involved in the robbery. Gore himself would run into the bank in a crouched position carrying a paper, plastic, or canvas bag; vault over the counter; remove the entire teller tray along with the money; and put the trays and the

money into his bag. One accomplice would be the getaway driver outside; another would stand near the door, brandish a gun or a sawed-off shotgun (at his preference), and order everyone in the bank to lie on the floor. Some of his robberies included a second vaulter, that is to say, a fourth accomplice, although only three were involved in the robbery of the Community National Bank. After taking the teller trays, Gore would vault back over the counter and run from the bank, again in a crouched position. The robbers would drive from the bank a few blocks to where they had previously left the switch car. There they would abandon the getaway car, drive in the switch car to another area, abandon that car, and then split up.

This evidence was so plainly relevant as to be classic similar act evidence admissible under the rule and under our cases to show a modus operandi. *United States v. Hayes,* 553 F.2d 824, 828–29 (2d Cir.), *cert. denied,* 434 U.S. 867, 98 S.Ct. 204, 54 L.Ed.2d 143 (1977) (proof of identity by similar bank robberies). The other bank robberies had so many of the same features as readily to satisfy any requirement of *United States v. Corey,* 566 F.2d 429, 431 (2d Cir. 1978) (a case involving proof of guilty knowledge), that there be a "close parallel" between the crime charged and the prior act shown; indeed, the proof here went further, since appellant himself admitted he had a "trademark." *Corey* also stresses the significance of time lapse between the indicted charge and the similar act. *Id.* at 432. Here the other robberies to which Gore admitted occurred within four months before and three months after the robbery of the Community National Bank; they were thus closely proximate in time.

■ But appellant Gore argues that, even though the evidence was relevant, the trial court was required to weigh against the probative value of the evidence the possibility of unfair prejudice. Fed.R.Evid.

for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowl-

edge, identity, or absence of mistake or accident.

403.[4] He also objects because the trial court ruled that it would admit the evidence at the very beginning of the trial, before any witnesses had testified. He directs our attention to the cautionary dictum of *United States v. Leonard,* 524 F.2d 1076, 1092 (2d Cir. 1975), *cert. denied,* 425 U.S. 958, 96 S.Ct. 1737, 48 L.Ed.2d 202 (1976), that it is usually preferable for the trial court to await the conclusion of the defendant's case before admitting similar act evidence, a suggestion that was stated more imperatively in *United States v. Benedetto,* 571 F.2d 1246, 1249 (2d Cir. 1978). *See also United States v. Halper,* 590 F.2d 422, 432 (2d Cir. 1978). The rationale for this limitation is that the court will best be able to judge the prosecutor's need for the evidence after the defense; at that time the court may best weigh the probative value of the evidence against its prejudicial effect. Here, however, it was abundantly clear to the trial judge before the case began that the only major issue was the identity of the robbers, that is, did Gore and/or Danzey commit this robbery. There was no way for Gore to remove the identity issue from the case short of Gore's admitting his participation in the robbery and claiming some other defense such as duress.[5]

Were the *Leonard* dictum applicable, however, the Government would have had no case. Unless this evidence were admissible during the Government's case, the Government might well be without any proof whatsoever of identity, a crucial issue. It was the only proof, and it was surely highly relevant proof, to take the case to the jury since the only other evidence linking Gore to the crime was a fingerprint on a paper bag found in the getaway car, allegedly used to carry money taken in the robbery. Thus in this case, because the defense rested without putting on a case, the evidence of Gore's other crimes, if it could only have been admitted at the close of the defense case, would never have been admitted; the case would have ended with the doing of the act and the defendant's responsibility for it unproven.

Does this mean that we must reject that dictum or that the evidence was inadmissible? We think not, and we believe that we can demonstrate this if we elaborate upon the distinction between admitting similar acts to show intent on the one hand and to show design, system, or plan on the other. Our cases have not expressly made this distinction, one made by the leading textwriters. Wigmore's treatise points out that similar acts are admitted to prove *intent* on the basis that from the point of view of the doctrine of chances, the element of innocence is eliminated by multiplying instances of the same result. That is to say, "similar results do not usually occur through abnormal causes"; and the recurrence of a similar result in the form of an unlawful act tends to negative accident, inadvertence, duress, good faith, self-defense, or other innocent mental state and tends to establish to at least some extent the presence of criminal intent. The act itself is assumed to be done, either because the defendant has conceded doing the act or because the court instructs the jury not to consider the evidence until they find that the defendant did the act and they proceed to determine intent. *See generally* 2 J. Wigmore, *Evidence* § 302, at 196–201 (3d ed. 1940).

---

4. Fed.R.Evid. 403 provides:

    Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

5. This case is thus completely distinguishable from *United States v. Manafzadeh,* No. 78–1220, slip op. 1089, 1099, 592 F.2d 81, 87 (2d Cir. Jan. 23, 1979), in which we held that the prosecution could not introduce evidence of similar crimes as bearing on the defendant's criminal intent where intent was only "technically at issue, [but] not really in dispute" in light of the defense of no involvement at all in the criminal conduct and defense counsel's offer to stipulate the existence of intent if the jury found the other elements of the offense. *Cf. United States v. Williams,* 577 F.2d 188, 191 (2d Cir.) (similar acts admissible because defendant did not affirmatively take issue of intent out of the case), *cert. denied,* —— U.S. ——, 99 S.Ct. 196, 58 L.Ed.2d 179 (1978).

When, however, the very doing of the act charged is still to be proved, one of the evidentiary facts receivable is the person's design, system, or plan to do it as demonstrated by his having committed other acts almost identical to the act charged. *See* 1 *id.* § 102; 2 *id.* § 304. *See also* 2 Weinstein's Evidence ¶ 404[09], at 404–57 to –66. By "a concurrence of common features . . . the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations." 2 Wigmore, *supra,* § 304, at 202 (emphasis omitted).[6] In this case, for example, there is such a high degree of simi- larity between the bank robberies admitted to and this one that the other crimes lead to the logical inference, by virtue of the combination of common features, that a common plan or design was at the basis for all the robberies and hence that it was appellant Gore who committed this robbery.

 ██  Drawing the distinction that Wigmore and McCormick, note 6 *supra,* draw helps explain why the government should ordinarily be permitted to introduce similar act evidence in its case-in-chief if the evidence is relevant to identity (used as a shorthand for referring to proof of the doing of the criminal act by this defendant),[7]

---

**6.** The commentators have stated that evidence of other crimes offered to prove identity or common plan or design must be more similar than when those crimes are offered to prove intent. As Wigmore explains,

> But where the conduct offered consists merely in the doing of other similar acts, it is obvious that something more is required than that mere similarity, which suffices for evidencing Intent. . . . The object here is not merely to negative an innocent intent at the time of the act charged, but to prove a pre-existing design, system, plan, or scheme, directed forwards to the doing of that act. In the former case (of Intent) the attempt is merely to negative the innocent state of mind at the time of the act charged; in the present case the effort is to establish a definite prior design or system which included the doing of the act charged as a part of its consummation. In the former case, the result is to give a complexion to a conceded act, and ends with that; in the present case, the result is to show (by probability) a precedent design which in its turn is to evidence (by probability) the doing of the act designed.

2 J. Wigmore, *Evidence* § 304, at 202 (3d ed. 1940). The insistence on a greater degree of similarity gives rise to the requirement of the "concurrence of common features." Wigmore points out that

> the difference between requiring *similarity,* for acts negativing innocent Intent, and requiring *common features indicating common design,* for acts showing Design, is a difference of degree rather than of kind; for to be similar involves having common features, and to have common features is merely to have a high degree of similarity. . . . Nevertheless the distinction is a real one. . . . The clue to the difference is best gained by remembering that in the one class of cases the act charged is assumed as done, and the mind asks only for something that will negative innocent intent; and the mere prior occurrence of an act similar in its gross

features—*i. e.* the same doer, and the same sort of act, but not necessarily the same mode of acting nor the same sufferer—may suffice for that purpose. But where the very act is the object of proof, and is desired to be inferred from a plan or system, the combination of common features that will suggest a common plan as their explanation involves so much higher a grade of similarity as to constitute a substantially new and distinct test.

*Id.* at 204.

McCormick agrees with Wigmore. He includes as purposes for which similar act evidence is admissible, notwithstanding the prohibitions on character evidence, "[t]o prove other like crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused"; but he notes that "much more is demanded than the mere reported commission of the same class. . . . The device used must be so unusual and distinctive as to be like a signature." McCormick's Handbook of the Law of Evidence § 190, at 449 (E. Cleary ed. 1972) (footnotes omitted). McCormick also notes that although similar crimes can be used to prove identity, "a need for proving identity is not ordinarily of itself a ticket of admission, but . . . the evidence will usually follow, as an intermediate channel, some one or more of the other theories," particularly continuing plan, scheme, or conspiracy, and distinctive device. *Id.* at 451.

**7.** Two recent similar acts cases from this circuit are noteworthy here. In *United States v. Benedetto,* 571 F.2d 1246, 1249 (2d Cir. 1978), the court held that the evidence of similar crimes was not admissible under Fed.R.Evid. 404 because intent was not really in dispute and there were insufficient unusual or distinctive characteristics of the similar acts offered so as to constitute a "unique scheme or pattern" admissible to show a general plan, scheme, or design. But the court held that the

but not, *see Leonard, supra,* if the evidence is relevant merely to intent.[8] At a minimum, the Government must prove that this defendant committed the crime for which he is on trial, so that identity evidence may properly constitute part of its case-in-chief even if there will be a defense case. *Compare United States v. O'Connor,* 580 F.2d 38 (2d Cir. 1978).[9]

■■ Proof of intent on the other hand may be inferable from the act itself.[10] In such case, unless the defense specifically raises lack of intent as a defense, the prejudice to the defendant of evidence of similar acts may outweigh its probative value. And even where the crime requires specific criminal intent not readily inferable, the

evidence was properly admitted under Fed.R. Evid. 607 to impeach the credibility of the defendant, on trial for receipt of money in connection with his official duties, who testified that he had never taken bribes from anybody. We note that although one of the witnesses testified in the Government's case-in-chief and the court indicated that it would have been better if the Government had delayed the testimony until rebuttal, citing *Leonard,* the court stated that it "[did] not regard that as controlling in view of the totality of circumstances here," *id.* at 1250, including the Government's offer to delay the admission of the evidence.

In *United States v. Gubelman,* 571 F.2d 1252, 1255 n. 12 (2d Cir.), *cert. denied,* 436 U.S. 948, 98 S.Ct. 2853, 56 L.Ed.2d 790 (1978), decided the same day by the same panel as *Benedetto,* the majority opinion stated that more than "unique signature crimes are admissible under the rubric of identity," *citing* 2 Weinstein's Evidence ¶ 404[09], at 404–55 to –67 (1976). *Gubelman* did not involve a unique scheme, and the court expressly declined to determine whether the evidence was "so intertwined with the acts forming the basis of the indictment as to clearly justify its admission under the rubric of common scheme or plan." 571 F.2d at 1254. Rather, in a case where the defendant challenged the accuracy of the prosecution witnesses' identification of him, the majority held that the similar act evidence, testimony that the defendant took two bribes other than the two for which he was on trial, was admissible because the defendant "[had] sufficiently raised the issue of mistaken identity." *Id.* The opinion did not discuss, however, the question of the time when the evidence might be introduced and accordingly does not refer to the *Leonard* dictum. In our case, the evidence is so highly similar as to constitute a "signature" so that the evidence is plainly admissible and the real question remaining is one of timing.

defendant might not raise lack of intent as a defense, note 5 *supra,* or he might stipulate to the existence of intent if the jury finds the other elements of the offense. *Id.*

■ Thus, to sum up, where, as here, similar acts are offered to prove design, from which the jury could infer that appellant Gore committed the particular bank robbery in question, the *Leonard*[11] dictum as to awaiting the conclusion of the defense case is inapplicable.

■ Of course this evidence is prejudicial—it is highly prejudicial because it both tends to prove the commission of the criminal act in issue, as well as to show the defendant's bad, or criminal, character.

**8.** In *United States v. Williams,* 577 F.2d 188, 191–92 (2d Cir.), *cert. denied,* —— U.S. ——, 99 S.Ct. 196, 58 L.Ed.2d 179 (1978), we did hold in a conspiracy case that evidence of other crimes was admissible to prove intent where that intent went to show participation in the conspiracy, *i. e.,* agreement, an issue in dispute. As in *Gubelman, supra,* the defendant did not challenge the timing of the introduction of the evidence but only its admissibility. Moreover, the court noted *en passant* that the evidence was not admitted until "the close of the Government's case," *id.* at 193, and that the defense did not present a case. *Id.* at 191 & n. 4.

**9.** Of course, if the defendant concedes the issue to which the similar acts are relevant, the evidence may be inadmissible not only under Rule 403 but also Rule 404(b). *See* note 5 *supra.*

**10.** Again, if the crime requires only a general criminal intent, evidence of specific intent or knowledge may be unnecessary and inadmissible under Rule 404(b). *See United States v. Benedetto, supra,* 571 F.2d at 1249 (knowledge and intent were only technically at issue and not really in dispute).

**11.** Even in *Leonard,* while the court said that it would have been preferable had the trial judge excluded the evidence at least until the presentation of the defendant's case, the court upheld the conviction notwithstanding the admission of the evidence during the prosecution's case-in-chief. *United States v. Leonard,* 524 F.2d 1076, 1092 (2d Cir. 1975), *cert. denied,* 425 U.S. 958, 96 S.Ct. 1737, 48 L.Ed.2d 202 (1976).

*United States v. Halper,* 590 F.2d 422, 432 (2d Cir. 1978), where the *Leonard* dictum was restated, was an intent case.

But common design evidence is always highly prejudicial. The *undue* prejudice it engenders may be guarded against in only one way: by an instruction—as was given here—to the effect that the jury is not to consider the evidence as going to the character of the accused but only as going to identity. It may well be that the jury cannot make this distinction in its collective mind. If that is so it is unfortunate, but it happens all the time—critical evidence may well be prejudicial, but it is admitted because it is so clearly relevant and so highly critical: Lady MacBeth's "damned spot" would have been admissible.

## THE IDENTIFICATION TESTIMONY

 It is quite clear that Sylvia Csuros's testimony was the only evidence against appellant Danzey at trial. Appellant Danzey argues that her identification of his photograph at the time of the second photographic spread in the United States Attorney's office one and a half weeks prior to trial should have been suppressed as unnecessarily suggestive. He also argues that because the identification procedure gave rise to a "very substantial likelihood of irreparable misidentification," citing *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968), she should have been precluded from making an in-court identification. And finally Danzey argues, even if the court did not err in admitting the evidence, Ms. Csuros's contradictory testimony, uncorroborated by other proof, was insufficient to support a verdict of guilty.

In reference to the conducting of the second photographic spread, the argument is not that the photographs themselves were suggestive but that the Government improperly reaffirmed the witness's prior identification of Danzey when the prosecutor displayed the same spread shown to her previously and, according to her testimony, told her that she was "looking at [the photos] again similarly as the way I was looking at them the previous year, to see if I could still pick out the same person as I picked out the last time." She testified

that she would have recognized the photographs even if she had not inadvertently seen her initials on the back of them "because I remember what I saw in September." The evidence also showed that she came to the office because she received a phone call from an FBI agent who told her that "the men who were involved in the robbery had been apprehended." At the same time, however, she testified that she did not initially infer that the men she had identified were in custody because her original identification had been uncertain. As she said at the suppression hearing, "If I may bring up a former point, I never said I identified them. I said I tentatively identified them and I was not in a position to make any kind of inference based on that." In any event, she did select the same photograph out of each of the two photographic arrays that she had previously selected, that is, the photographs of Danzey and Irving.

We start with the assumption here that her initial photographic identification, a month after the robbery, was not impermissibly suggestive and was properly admissible. Appellant makes no claim that the first identification was suggestive, and all the evidence is to the contrary. At the time of the second photographic identification, it is also clear or we must assume that even though the FBI agent told her that the FBI had apprehended the men who were probably involved, Ms. Csuros had no cause to believe that they were the same men whom she had identified. At that display in the United States Attorney's office on July 6, 1978, the Assistant United States Attorney said nothing to her except to try to pick out the same persons that she had the last time, and this she did with ease. But the prosecutor made *no other* suggestion nor did he tell Ms. Csuros anything other than to the effect that her choices were the same. Thus *United States v. Jarvis*, 560 F.2d 494 (2d Cir. 1977), *cert. denied*, 435 U.S. 934, 98 S.Ct. 1511, 55 L.Ed.2d 532 (1978), and *United States v. Moskowitz*, 581 F.2d 14 (2d Cir.), *cert. denied* —— U.S. ——, 99 S.Ct. 204, 58 L.Ed.2d 184 (1978), are not apposite; the agents in those cases specifically advised the witness

whether he or she had selected a correct or an incorrect photograph.

■ Appellant Danzey makes much of the prosecutor's suggestion to Csuros that she attempt to select the same people whom she had selected at the previous photographic spread, but she would have selected the same people in any event because she remembered them well. Although it might have been preferable for him to have asked her on the second occasion to try to select the people whom she had seen on the day of the robbery, no case cited to us indicates that it was impermissibly suggestive for him to have phrased her task as he did. Indeed, *United States v. Higginbotham*, 539 F.2d 17, 23 (9th Cir. 1976), indicates that a prosecutor has a duty again to interrogate a witness before trial to make certain that the witness's testimony is going to stand up, particularly where other law enforcement agents have conducted the previous photographic spread. *See also United States v. Evans*, 484 F.2d 1178 (2d Cir. 1973); *United States v. Bennett*, 409 F.2d 888, 898–99 (2d Cir.), *cert. denied*, 396 U.S. 852, 90 S.Ct. 113, 24 L.Ed.2d 101 (1969) and 402 U.S. 984, 91 S.Ct. 1670, 29 L.Ed.2d 149 (1971); *United States v. Magnotti,* 318 F.Supp. 535, 537 (D.Conn.1970), *aff'd*, 454 F.2d 1140 (2d Cir. 1972). We note that the prosecutor and law enforcement officers here particularly refrained from showing appellant Danzey himself to the witness even though he was in custody. This restraint sharply distinguishes this case from *Jackson v. Fogg*, 589 F.2d 108 (2d Cir. 1978), where three of the four identification witnesses, who went to the police station in response to a request to view an apprehended suspect in a lineup, saw the suspect alone before he was put into the lineup. Thus we find nothing in this case to warrant the suppression of the second photographic identification.

■ The in-court identification, which Ms. Csuros made at the beginning of her testimony, was thus not tainted by either pretrial identification; and there is no indication that it was any more suggestive than any other in-court identification where a defendant is at the defense table with law-

yers and any witness who has watched television knows that this table is the place to look for purposes of answering the question "Do you see the person whom you saw at the scene in this courtroom?" The subsequent inconsistencies in Ms. Csuros's testimony go not to the admissibility of her in-court identification but to the weight to be given to it, a matter which the trial court charged very carefully, and perhaps to sufficiency of the evidence, which we now discuss.

## SUFFICIENCY OF EVIDENCE

■ The inconsistencies were several. We have recounted them above. They were also serious. Nevertheless we do not think that they were such as to take the case away from the jury, under the totality of the circumstances. *See Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). In the first place, the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction. *See United States v. Smith*, 563 F.2d 1361 (9th Cir. 1977), *cert. denied*, 434 U.S. 1021, 98 S.Ct. 747, 54 L.Ed.2d 769 (1978); *United States v. Levi*, 405 F.2d 380, 382 (4th Cir. 1968); 7 J. Wigmore, *Evidence* § 2034 (3d ed. 1940). It is true as Judge Lumbard points out in *Jackson v. Fogg, supra*, 589 F.2d at 112 that "[i]n England and America most of the spectacular miscarriages [of justice] have been due to wrong identification of the defendant as a culprit" (quoting Glanville Williams, *The Proof of Guilt* (3d ed. 1963), at 106), and that accordingly we must scrutinize such evidence with care. In this case, however, each of the inconsistencies noted is explicable on the basis that the witness attributed to one of the two people whom she identified some of the qualities or characteristics of the other.

Thus her testimony as to the skin color of the shorter man—whether he was dark, as she first testified at trial, or light, as she subsequently testified at trial and according to her testimony at the suppression hearing she had told the FBI agent on the day of

the robbery—could have been simply a mis-recollection of the event, compounded perhaps by the variations in the lighting in the photographs. So too with her recollection of the bulging eyes, which she attributed at the suppression hearing to the taller man and at trial to the shorter one. The inconsistency may be explained on the basis of confusion as to which man had which characteristics. Indeed, Ms. Csuros commented in her testimony at trial in explaining the inconsistencies in her testimony that the confusion might be the result of remembering the faces but not quite remembering which body went with which face.

As to her identification of appellant, at both of the photographic spreads as well as at trial, she did identify him as the shorter man. When she stated at the suppression hearing that she now knew the taller man to be Danzey, she could easily have misspoken herself. We note that there was considerable confusion on the part of the court and counsel as well as to which exhibit was the picture of the shorter man and which the taller. The crucial identifications themselves were consistent.

The Court of Appeals for the Fifth Circuit has reversed a conviction for insufficiency of the evidence where a sole witness was unsure and there were no other connecting or corroborating facts or circumstances, holding that the evidence did not amount to proof of guilt beyond a reasonable doubt. *United States v. Johnson*, 427 F.2d 957, 961 (5th Cir. 1970). Here it appears to us that the witness was not unsure; she was simply confusing the characteristics of the two men. And in fact, there is a measure of corroboration of her identification, as well as her testimony on appellant's height, in the teller's testimony that the man controlling the banking floor was about five feet seven inches tall, and the bank manager's that he was about five feet eight inches or five feet nine inches tall.

## SEVERANCE AND *BRUTON*

Thus it becomes incumbent upon us to determine the question of severance, that is, whether as a result of denial of appellant Danzey's motion for severance he was prejudiced by the "spill-over" of the other crimes evidence pertaining to his codefendant as well as by a denial of his confrontation rights under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), so as to warrant a new trial. In this regard the testimony of the FBI agent who testified as to Gore's other bank robberies becomes critical. Agent Augustitis testified that Gore had admitted the commission with nine males of fifteen New Jersey and Staten Island bank robberies. Had this been all, the admission would not have been clearly inculpatory of Danzey nor vitally important to the Government's case against Danzey under the test enunciated in *United States v. Wingate*, 520 F.2d 309, 313–14 (2d Cir. 1975), *cert. denied*, 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976) (redacted codefendant's statements referring to unnamed individual admissible, with cautionary instructions, where standing alone they did not inculpate Wingate and were not powerfully incriminating), followed in *United States v. Knuckles*, 581 F.2d 305, 312–13 (2d Cir. 1978) (reference to "other persons" in codefendant's statement). But here Agent Augustitis also testified that Gore *had named* the nine men although none of the names given were mentioned. Danzey's counsel moved for a mistrial, having previously at the side bar asked that the witness be instructed "not to raise any inference that other people were involved in the other robberies." The absence of testimony about the names even though Gore had named Danzey as having assisted in three of the robberies might seem at first blush, as it did to the trial judge, to have been to Danzey's great advantage (and within *Wingate* and *Knuckles, supra*). But, of course, naming him would have involved a direct violation of his confrontation rights under the *Bruton* rule,[12] so that even on the basis

---

12. In *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Court held that the admission against the defendant of an oral confession of a codefendant inculpating the defendant violated the defendant's right of cross-examination secured by the Confronta-

of the testimony that Gore had named names albeit not giving those names themselves it is not altogether surprising that counsel moved for a mistrial rather than "jumping up and down for joy" or "clapping [his] hands for joy," as the trial court suggested that he should do. Even on the agent's testimony that names were named, the jury could readily infer that Danzey was among them.

The evidence went further still into the area of comment within the sweep of *Bruton* by the agent's testimony relating what Gore had said with reference to several specific banks and then the admission into evidence of Gore's signed statement as to one of the banks, the Valley National Bank of Nutley, New Jersey. The agent read the statement to the jury with the word "Blank" substituted for the name of the accomplice. As Danzey's trial counsel put it, renewing his motion for a mistrial, the use of the word "Blank" made "it certain that the jury knew that the names were being redacted of the individuals in question." The ready inference that the name Danzey would "fill in the blank" because Danzey was the codefendant, it could readily be argued, violated appellant Danzey's right of cross-examination under the Confrontation Clause of the Sixth Amendment, as held in *Bruton*, because Gore was not about to and did not subject himself to cross-examination by Danzey's counsel; and thus his statement inculpating Danzey was hearsay as to Danzey.[13]

tion Clause of the Sixth Amendment, overruling *Delli Paoli v. United States*, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957) (instructions would permit jury to disregard statement against the defendant). Said Mr. Justice Brennan for the *Bruton* court:

Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others. The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination. It was against such threats to a fair trial that the Confrontation Clause was directed.

391 U.S. at 136, 88 S.Ct. at 1628 (footnotes omitted).

13. The following colloquy ensued:

The Court: Of course, if it were the fact that Mr. Danzey were not involved in any other bank robbery then you wouldn't have this problem but the *Bruton* rule has established a rather false premise because they have said that you can't read the testimony of a co-defendant who has implicated a defendant. That is the posture you are in. The jury is not going to draw inferences one way or the other.

Mr. Wirfel [counsel for Danzey]: I am placed in that posture through no fault or action of mine.

The Court: Well, now don't say that because you are placed in that posture because, in fact, your client, apparently, was involved in these other robberies, at least, according to Mr. Gore.

This colloquy demonstrates two misimpressions under which the trial court was evidently operating. The first is that it assumes the "truth" of inadmissible hearsay. But the *Bruton* problem arises not only when the hearsay evidence is unreliable but, because of the Sixth Amendment right to confrontation, *whenever* the codefendant's statement, admission, or confession inculpates the objecting defendant, regardless of the possible truth of the accusation. Second, the "rather false premise" attributed to the Supreme Court is quite conclusively answered in Mr. Justice Brennan's opinion for the *Bruton* Court:

In Judge Hand's view the limiting instruction, although not really capable of preventing the jury from considering the prejudicial evidence, does as a matter of form provide a way around the exclusionary rules of evidence that is defensible because it "probably furthers, rather than impedes, the search for truth . . . ." *Nash v. United States*, 2 Cir., 54 F.2d 1006, 1007. Insofar as this implies the prosecution ought not to be denied the benefit of the confession to prove the confessor's guilt, however, it overlooks alternative ways of achieving that benefit without at the same time infringing the nonconfessor's right of confrontation. Where viable alternatives do exist, it is deceptive to rely on the pursuit of truth to defend a clearly harmful practice.

*Bruton v. United States, supra*, 391 U.S. at 133–34, 88 S.Ct. at 1626, 1627 (footnotes omitted). As we have noted in text, there was an alternative available here. The *Bruton* Court itself suggested redaction of the confession, *id.* n. 10, and it is difficult to believe that this suggestion contemplated the deletion of the defendant's name and the substitution of the word "Blank." The Court said "deletion of *references* to codefendants," and the rationale would seem to apply no less clearly in this case where the reference was not actually to the defendant but could have been interpreted to be one.

There was an available alternative here: for the prosecutor to have left it open in the testimony whether Gore had named the names of his accomplices and to have, in the case of the Valley Bank written statement, simply referred to the other individual who went into the bank with Gore without referring to him as "Blank" and thus preventing, as counsel argued, the jury from knowing that the name of a particular individual had been redacted. Full exploration of the *Bruton* issue as requested by counsel before trial as set forth in *United States v. Glover*, 506 F.2d 291, 299 (2d Cir. 1974) ("*before* the jury comes into the box") (emphasis in original), could have avoided the problem by use of this alternative or might have led the court to grant a severance.

By failure to engage in such exploration, Danzey was deprived of a fair trial, at least where as here the admissions related to similar acts as we have above stated. As we cautioned in *United States v. Rosenwasser*, 550 F.2d 806, 808–09 (2d Cir.), *cert. denied*, 434 U.S. 825, 98 S.Ct. 73, 54 L.Ed.2d 83 (1977), similar act evidence must be particularly scrutinized for its prejudicial spill-over effect on a codefendant. Thus where the Government's case against one codefendant rests wholly on that evidence as it did here, the trial court must be particularly careful to avoid *Bruton* implications by sharp redaction or by grant of a severance, neither of which occurred here. Despite the obviousness of Gore's guilt, the jury was out from before the luncheon recess on July 20, 1978, until 3:35 p. m. on July 21, with their only request being to rehear the complete testimony of Ms. Csuros, which was, as noted, replete with inconsistencies. The case was a close one; the introduction in evidence of the Gore admissions, the testimony that he had named names, and the failure properly to redact the written statement as to the Valley Bank robbery surely may have affected this verdict.[14]

14. We say this even without recourse to the uncontested affidavit of counsel accompanying appellant Danzey's motion for a new trial to the effect that a number of jurors spoke to the prosecutor's assistant immediately after the return of the verdict, asking if Gore had named

Judgment affirmed as to Gore; reversed and remanded for a new trial as to Danzey.

Danzey as an accomplice in the confession. According to the affidavit, upon receiving an affirmative answer, several of the jurors said, "We thought so," "You see—I told you," or "We figured that," with others nodding their heads in agreement.