UNITED STATES, Appellee,

v.

Emery L. FRANKLIN, III, Specialist
U.S. Army, Appellant.

No. 67,247.

CM 8901303.

U.S. Court of Military Appeals.

Argued June 4, 1992.

Decided Sept. 24, 1992.

For Appellant: *Captain Edward T. Keable* (argued); *Lieutenant Colonel James H. Weise* and *Captain James M. Heaton* (on brief); *Colonel Robert B. Kirby*.

For Appellee: *Captain Timothy W. Lucas* (argued); *Colonel Dayton M. Cramer, Lieutenant Colonel Daniel J. Dell'Orto, Captain Emmett G. Wells* (on brief).

## Opinion of the Court

CRAWFORD, Judge:

On January 14 and 23; February 13; and April 3, 10, 11–14, and 17, 1989, appellant was tried by a general court-martial composed of officers and enlisted members at Bad Kreuznach and Mainz, Germany. Contrary to his pleas, appellant was convicted [*] of premeditated murder, attempted rape, and felony-murder, in violation of Articles 118 and 80, Uniform Code of Military Justice, 10 USC §§ 918 and 880, respectively. Appellant was sentenced to a dishonorable discharge, confinement for life, total forfeitures, and reduction to Private E1. The convening authority approved the sentence, and on August 15, 1991, the Court of Military Review affirmed the findings as to premeditated murder and attempted rape, and the sentence. This Court granted appellant's petition for review on the following issue:

> WHETHER THE MILITARY JUDGE ERRED BY PERMITTING THE GOVERNMENT TO INTRODUCE EVIDENCE OF APPELLANT'S PRIOR BAD ACTS TO SHOW HIS NEGATIVE "ATTITUDE" TOWARD WOMEN.

### I

Appellant was convicted of brutally murdering Meline Uzunkaranfil, a vibrant, chaste, 17–year–old female of Turkish descent, on September 30, 1988. According to the Government's version of the facts, *see United States v. Seger*, 25 MJ 420, 421 (CMA 1988), on the evening of September 29, 1988, after appellant had returned from a Reforger exercise, he entered the room of Private (PVT) V and asked to borrow his knife. PVT V initially hesitated in granting appellant's request but relented due to appellant's persistence. Appellant then proceeded to the Mainzeldorf, a German discotheque and bar, where he met Meline. While in the Mainzeldorf, appellant kissed, hugged, and danced with Meline throughout the night. Meline was later seen holding hands and leaving the Mainzeldorf with appellant around midnight. She was never seen alive again.

Second Lieutenant Davis discovered Meline's bloodied corpse while he was jogging on the morning of September 30, 1988. Meline had been stabbed 91 times: including 15 times in the back, 26 times in the neck, 28 times in the chest, and 9 times in the abdomen. Although many of the wounds could have been fatal, the ultimate cause of death was loss of blood. Meline's corpse also showed severe bruising around her left shoulder, left ear, left cheekbone, lower jaw, and lip; her jacket was pulled open, and her shirt was pulled up over her chest exposing her bra and one breast.

Around 2:00 a.m. in the early morning hours of September 30, 1988, appellant telephoned Specialist (SPC) Brandon, the Unit Charge of Quarters (CQ) runner, and asked whether his wife had called him. After SPC Brandon assured appellant that there had been no such inquiries, their conversation ceased. SPC Brandon opined at trial that appellant had been drinking and described his speech as "fast." He also opined that appellant had called him from a pay telephone based upon the background noise. Meline's body was found within 1.5 miles of appellant's residence, an area containing several telephone booths. A motorcyclist noted a suspicious light-colored car, like appellant's, stopped near the crime scene around 2:00 a.m.

Appellant's wife, in an interview with an investigating agent (which the agent testi-

---

[*] This was referred as a capital case, but the findings were not unanimous so the death penalty was not a permissible punishment. *See* RCM 1004(a)(2), Manual for Courts-Martial, United States, 1984 (Change 2).

fied about at trial), recalled that appellant returned home around 2:30 a.m. or 2:40 a.m. on September 30, 1988, wearing the same red-and-white sweatsuit that he had gone out wearing the night before. She also recalled being awakened around 5:00 a.m. by the sound of her washing machine running. Appellant's T-shirt, red-and-white sweatsuit, socks and shoes, were all confiscated from the washing machine.

Later on the same day, appellant was arrested at his barracks. Prior to being arrested, he returned PVT V's knife. This knife was later analyzed by police crime lab officials who detected traces of blood consistent with Meline's. Dr. Mattern, the pathologist who conducted Meline's autopsy, found Meline's wounds to be consistent with the configuration of this knife.

Appellant's car was confiscated subsequent to his arrest. Blood splatters and foot prints consistent with the victim were found on the right rear portion of his car. A finger print analysis of the passenger door window revealed a print from Meline's hand. Before his arrest, appellant told a friend he could not play cards because he had to wash his car.

In his opening statement, defense counsel stated that the Government would offer "no evidence to indicate that there was premeditation involved in this case." He also suggested that the crimes were committed by "an uncontrolled individual, an individual who had lost control" and that the evidence would not support the Government's theory of attempted rape.

In order to prove the intent necessary for the crimes of premeditated murder and attempted rape the Government introduced "prior acts" evidence under Mil.R.Evid. 404(b), Manual for Courts–Martial, United States, 1984. The first "prior act" consisted of evidence that appellant accosted a young German girl, DR, whom he had picked up while driving with some friends in his car, in August of 1988. After DR accepted his invitation for a ride, appellant took the group to a friend's apartment, where he drank some gin. When the group departed the apartment, appellant began "coaxing" DR to have sex with him or any of the others: "Do you—would you want to fuck me? Would you want to fuck him [pointing to W, one of the passengers]?" Would you want to fuck M [another passenger]?" When DR declined appellant's solicitations, he persisted and jumped in the back seat of the car with her. When she continued to decline his offers he grew angry, raised his voice, and tried to touch her breast and vaginal areas. When DR fended him off with her hands, appellant demanded that she get out of the car, telling her: "Get lost, bitch."

The second "prior act" occurred in early September 1988, while appellant was involved in a Reforger field exercise shortly before Meline's death. One night while lying on his cot, appellant queried aloud to his tent mates, "Did you ever wonder what it would be like to kill a bitch."

Defense counsel objected to both "prior acts" evidence. The military judge denied the defense objections based on the following analysis:

> The federal courts, although I don't see this so much in the military appellate cases, have a particular dislike for admitting evidence under [Mil.R.Evid.] 404(b) going to intent. Their analysis is that mens rea is almost always something that has to be proven, and 404(b) evidence offered to prove intent—the judge, when asked to admit it for that purpose, should be very skeptical in admitting it because of that fact, and should wait until all of the evidence is in to see whether the evidence is needed. The courts also say that admissibility of 404(b) evidence is, or should be, determined in part based upon necessity. Does the proponent need the evidence? If you have a lot of direct evidence as to the purpose for which the evidence is being offered, you don't need it. Why muddy up the case by putting evidence before the court that might be misconstrued?

Applying this analysis the military judge proceeded to explain why he was nevertheless admitting the evidence. With respect

to the statement in the tent, the military judge questioned whether it was even covered by Mil.R.Evid. 404(b):

This isn't evidence of other crimes, wrongs, or arguabl[y] even acts. It's just a verbal question. If that's the case—if it's not covered by 404(b)—then I don't need to go through this. It's just a question of relevance. Assuming arguendo, that it is a 404(b) issue, my analysis would be as follows: It seems to me that it really doesn't go to the accused's intent to kill directly, but it goes more towards the accused's mental attitude and his mental status. It's still something very similar to mens rea, and that's the purpose for which it is offered. The Government, as was just discussed, has very little evidence going to intent, and this is true for both purposes that this evidence is being offered upon. The evidence is not only circumstantial, but it's what we might call indirect circumstantial evidence. Ordinarily you would have something to infer from to get intent that's a lot more direct than what we have here. What we have here with respect to intent to kill is just what was discussed. The position—appearance of the body—cause of death, the stab wounds, Mr. Hazelwood's testimony [*see infra* at (313–314)], and that's about it. So it does appear that the Government is in need of additional evidence of intent to kill. Even so, the probative value of this question, which is not a statement of intent—it's a question—the probative value I find to be somewhat moderate. I find it to be a rather strange and unique question. "Did you ever wonder what it would be like to kill a bitch." I'm not used to hearing statements made like that.... Now, this occurred earlier in September during REFORGER, and this incident occurred on the early morning of 30 September, so there's not a great chronological or temporal separation between the statement made in the field and the murder. In terms of prejudicial value, I see very little prejudicial value at all. It's not misconduct. It's merely a question reflecting what's going on in the accused's mind, so I find that the probative value certainly substantially outweighs the prejudicial value. It is relevant, so I'll allow it.

With respect to the incident involving DR, the military judge analyzed the evidence as follows:

With respect to the other one—the incident during the summer—this one causes me more concern. It causes me more concern mostly because the finders of fact, I think, will have a greater inclination to misuse this evidence because, first of all, it can be inferred that there was a crime committed here: Indecent assault. What happened that day, again, goes not so much directly toward specific intent to rape, but more toward the accused's mental attitude and mental status, his attitudes, towards matters of sex. That also bothers me because the line between that and propensity evidence becomes finer and finer. What happened with DR, and assuming the accused was the perpetrator of the murder, what happened there, if you follow the Government's theory of the case, are somewhat similar, and I'm sure that the Government's theory of the case is that the accused met with the victim at the bar. They kissed and embraced. The accused thought he was going to score. He gets her to go to the car. They go to a private place. At one point the victim no longer accedes to his physical requests, and from there it deteriorates into the end result that we have....

\* \* \*

With respect to DR, the accused, in daylight, with two other soldiers in the car, picks up the girl. They ride around for awhile. At one point he demands sexual favors for himself and/or the other people. She refuses. He becomes angry and forces her to leave the car. There's an element of coercion there. It's not quite, but it's close to some of the old jokes, put up or get out. Again, as I said, it does, under 404(b), go to the accused's mental status and mental attitude, and I think that is a proper purpose

under 404(b). It is legally relevant and I find that the probative value is not substantially outweighed by the prejudicial effect. I find that the probative value is rather high in this case. First of all, because of the somewhat similar context that these incidents occurred in. More particularly because it does say something about the intent to rape. The Government doesn't have a whole lot there. Therefore, the evidence is certainly necessary. The Government doesn't have a whole lot that is more probative than that....One other thing with respect to the DR situation. That, of course, did not lead to a rape, and that's another thing that distinguishes that from the Government's theory in this case; apparently there was no rape in that case either, but the consequences and the end result, of course, were substantially different and I recognize those distinctions.

As to the statement in the tent, the military judge proposed a limiting instruction after the witness testified, but defense counsel waived any instruction on the basis that "the less said about this statement and the less influence it receives in the members' minds, the better."

Regarding the incident with DR, the military judge was concerned that "the testimony did not meet the offer of proof" because she was unable to testify "that she was ordered to get out of the car." The military judge stated that "[o]ne of the things that convinced [him] to admit" her testimony was the "element of coercion" indicated by appellant's ordering her out of the car. Defense counsel made a motion to strike D's testimony but the military judge denied the motion on the basis that the evidence "still has probative value but not as much as it did before, but its probative value still, in my opinion, outweighs its prejudicial effect." The military judge gave the following limiting instruction almost immediately after making his ruling:

Her testimony was admitted for its tendency, if any, to show how the accused approached gaining sexual favors and his response when his attempt was rebuffed as it may relate to his intent on 30 September to have sexual relations without the consent of the victim. That's a long way of saying "intent to rape," I suppose. That assumes, of course, that you find that the accused was, in fact, the perpetrator and I'm not suggesting that to you at all. It's not my job to make that determination. That will be your job when you've heard all the evidence.

Now, that's what you may consider the testimony for and you may consider it for that purpose only. You may not consider this testimony for any other purpose and you may not conclude from this evidence that the accused is a bad person or has criminal tendencies and that he, therefore, committed the offenses charged.

Whether the evidence has any weight, or how much weight it may have to prove the item that I said it was admitted for, is entirely up to you for whatever weight it may have. You may use it only for that very limited purpose.

Appellant's argument at trial was that the evidence was insufficient to prove beyond a reasonable doubt that appellant killed Meline. In particular, the defense attempted to prove that PVT L and Specialist C, who had also been at the discotheque, could have murdered her. PVT L admitted during his testimony that, when questioned by the German police, he lied about a knife found on his person, claiming that it belonged to appellant. This knife was tested by the crime laboratory but eliminated as the murder weapon.

On appeal, appellant claims that, "[a]t trial, the Government built its case against appellant on" appellant's "allegedly negative 'attitude' toward women." Appellant asserts that "[t]he Government laid the foundation for this theory through the" crime-scene-analysis testimony of Robert R. Hazelwood of the FBI. Final Brief at 3. Based on his review of the case and other violent crimes, Mr. Hazelwood described the probable killer as a single perpetrator who knew the victim; consumed alcohol

before the incident; and whose original motivation was sexual activity. The original motive turned to "highly personalized anger directed toward the victim" upon being rebuffed. Having established this framework, appellant asserts that the Government sought to perfect its case with the evidence of the two prior acts in order to show that appellant fit Mr. Hazelwood's profile of the unknown perpetrator. Appellant further argues that trial counsel disregarded the military judge's caution against arguing propensity to the panel in his closing argument which further prejudiced appellant. Defense counsel, however, did not object to trial counsel's closing argument.

## II

Appellant urges that the military judge erred by admitting evidence of both "prior acts" because they were relevant only to show impermissibly appellant's propensity to commit the charged crimes. Appellant also argues that he was prejudiced by admission of the evidence, particularly in light of trial counsel's closing argument which, he claims, impermissibly stressed appellant's propensity to commit the charged crimes.

### A

We agree that it was error to allow evidence of the incident involving DR; we disagree, however, that it was error to allow evidence concerning appellant's statement, "Did you ever wonder what it would be like to kill a bitch?" We also disagree that appellant was prejudiced by admission of the prior-acts evidence.

The limited admissibility of evidence of other crimes, wrongs or acts is specifically permitted by Mil.R.Evid. 404(b). This rule "is taken without change from the Federal Rule." Drafters' Analysis, Manual, *supra* at A22–32 (Change 2). Additionally, it "is viewed as an 'inclusionary rule' under which" evidence of logically relevant prior acts "is admissible except when" tending "to prove only criminal disposition." *Thompson v. United States*, 546 A.2d 414, 424 n.18 (D.C.App.1988).

The exclusion of evidence of one crime offered to show that an accused has a disposition or propensity to commit another crime ("sometimes referred to as the 'propensity rule'") is fundamental to Anglo–American jurisprudence and is rooted in Magna Carta. *Id.* at 418 (citing *People v. Molineux*, 168 N.Y. 264, 61 N.E. 286, 293 (1901)); *see United States v. Wingart*, 27 MJ 128 (CMA 1988). As stated by Judge (later Justice) Cardozo:

> [T]he principle back of the exclusion is one, not of logic, but of policy ... There may be cogency in the argument that a quarrelsome defendant is more likely to start a quarrel than one of milder type, a man of dangerous mode of life more likely than a shy recluse. The law is not blind to this, but equally it is not blind to the peril to the innocent if character is accepted as probative of crime. "The natural and inevitable tendency of the tribunal-whether judge or jury-is to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge."

*Id.* at 418–19 (quoting *People v. Zackowitz*, 254 N.Y. 192, 172 N.E. 466, 468 (1930)); *accord Drew v. United States*, 331 F.2d 85, 89–90 n.8 (D.C.Cir.1964). "The propensity rule does not ... preclude the admission of [prior acts] evidence ... when" that "evidence is [logically] relevant to issues other than the defendant's predisposition to commit the crime," 546 A.2d at 420; for example, intent or mens rea. Mil. R. Evid. 404(b).

Since intent is at issue in almost every criminal case because it is derived from the elements of the offense, it is often "difficult or impossible to differentiate between the intent to do an act and the predisposition to do it." 546 A.2d at 420. Hence, use of prior-acts evidence to prove intent has been the subject of intense litigation. *Id.* at 421 ("If the 'intent exception' warranted admission of evidence of a similar crime simply to prove the intent ele-

ment of the offense on trial, the exception would swallow the rule."). The resolution is simply that, where intent is not contested or is not an element of proof of the charged offense, such evidence is irrelevant. *See Estelle v. McGuire,* ––– U.S. –––, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *United States v. Gamble,* 27 MJ 298 (CMA 1988); *Thompson v. United States, supra; United States v. Danzey,* 594 F.2d 905 (2d Cir.), *cert. denied,* 441 U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056 (1979).

■ The state of mind of an accused at the time he or she commits the act charged becomes an issue at trial when it is a contested element of an offense. The issue is especially highlighted when, as here, evidence of innocent intent is presented by the defense. Here, in addition to being an element of the offenses charged, trial defense counsel opened the door to the issue of innocent intent in his opening statement by arguing that the Government would not be able to prove premeditation and attempted rape. *See United States v. Reynolds,* 29 MJ 105 (CMA 1989). Negating innocent intent differs with regard to specific- and general-intent crimes in the sense that the issue of intent may be more obviously at issue in specific-intent crimes, such as the ones at issue here: premeditated murder and attempted rape. *See Estelle v. McGuire, supra.*

■ Admission of prior-acts evidence to prove intent differs procedurally from admitting other types of Mil.R.Evid. 404(b) evidence. The standard for the type of other-crimes evidence that may be used to prove intent is less stringent than that required to prove a common plan. *See generally United States v. Danzey, supra.* (This is in contrast to the situation "where the very act is the object of proof, and is desired to be inferred from a plan or system, the combination of common features that will suggest a common plan as their explanation involves so much higher a grade of similarity as to constitute a substantially new and distinct test."). The evidence need not be an exact match, amount-

ing to almost a repeat of the charged act. Rather, evidence of merely a "prior occurrence of an act similar in its gross features- *i.e.,* the same doer, and the same sort of act, but not necessarily the same mode of acting nor the same sufferer" as the charged act is sufficient to negate innocent intent. *Id.* at 913 n.6.

"The proper timing of the decision whether to admit" prior acts to prove intent is after "the trial judge has sufficient knowledge of the government's need for the evidence, and of the defendant's defense, to make an informed judgment." *Thompson v. United States,* 546 A.2d at 423 (footnote omitted). Likewise, the *Military Rules of Evidence Manual* urges that "it is wise for the court to decline to admit evidence of other acts to prove intent until the defendant has an opportunity to put on evidence." S. Saltzburg, L. Schinasi, & D. Schlueter, *Military Rules of Evidence Manual* 362 (2d ed.1986).

In this case, the military judge admitted appellant's statement to prove appellant's specific intent to kill and the incident involving DR to prove appellant's specific intent to rape; ruled on admissibility of the prior acts at the conclusion of the Government's case; and tested both prior acts for admissibility under Mil. R. Evid. 404(b) and for prejudice under Mil. R. Evid. 403.

■ The military judge employed appropriate procedures and timing in making his determination of admissibility of both prior acts. The judge correctly identified the proper purpose for this evidence to be admitted, specific intent to kill and to rape, and waited until the close of the Government's case-in-chief to make his ruling. Although it is recommended that a judge wait until both parties present evidence on the merits before determining whether intent is at issue, the defense presentation was limited to admission of documentary evidence, including stipulations, and the trial strategy was to raise reasonable doubt as to appellant's guilt by cross-examining the government witnesses. We conclude that, accordingly, in this case there was no harm

to appellant due to the limited nature of the defense case on the merits.

B

With respect to appellant's query to his tentmates, "[d]id you ever wonder what it would be like to kill a bitch," we disagree with the military judge's suggestion that it is not a prior act as defined by Mil. R. Evid. 404(b). Although appellant's query may not have been unlawful, "[a]n act need not be a crime to be logically relevant." E. Imwinkelried, Uncharged Misconduct Evidence § 2:16 at 43 of Ch. 2 (1984). We hold the statement was relevant to establish appellant's intent to kill and was not unduly prejudicial, and so it was properly admitted.

Concerning the incident involving DR, however, we hold that the military judge abused his discretion in admitting the evidence. *Cf. United States v. Spata,* 34 MJ 284 (CMA 1992). The military judge noted that this incident caused him concern because it went more toward showing appellant's mental attitude towards matters of sex (and therefore his propensity to commit the crime) than toward proving his intent to rape. The judge also noted that the testimony of DR did not meet the Government's offer of proof because she was unable to testify that appellant ordered her out of the car. This element of coercion was one of the things that persuaded the military judge to admit the testimony in the first place. We hold that the military judge abused his discretion by admitting the evidence after it failed to meet the Government's offer of proof and that at a minimum the military judge should have granted the motion to strike.

Having held that the military judge abused his discretion in admitting the incident involving DR, we must test that error for prejudice. Appellant claims he was prejudiced because the Government perfected its case by showing that appellant fit Mr. Hazelwood's profile of the perpetrator and because trial counsel impermissibly argued propensity in his closing argument.

As regards appellant's first contention, we conclude that the other evidence in the record is overwhelming as to appellant's guilt to the charged offenses. In particular: appellant's dancing, kissing, and leaving the discotheque with Meline prior to her murder; appellant's curious call to the CQ runner around 0200 hours; the motorcyclist observing a light-colored car, like appellant's, stopped near the crime scene; appellant's having washed all the clothes he went out in, including his jogging shoes, around 0530 hours; appellant's borrowing and returning the knife with Meline's blood type and a pattern matching Meline's wounds; the blood splatters, foot prints, and fingerprint consistent with Meline's found on appellant's car; appellant's statement prior to his arrest that he could not play cards because he had to wash his car; and appellant's statement, "Did you ever wonder what it would be like to kill a bitch?"

With respect to appellant's second contention, a review of the entire portion of trial counsel's closing argument concerning the prior acts shows trial counsel related the prior acts to appellant's intent to rape and intent to kill. No objection to the argument was made at trial. Additionally, the military judge gave a limiting instruction after DR's testimony, thereby further mitigating the possibility of prejudice. In light of our review of the entire record in this case and the fact that the court below set aside appellant's conviction of felony-murder, we hold that appellant was not prejudiced by the erroneous admission of evidence concerning the incident involving DR.

The decision of the United States Army Court of Military Review is affirmed.

Judges COX, GIERKE, and WISS concur.

SULLIVAN, Chief Judge (concurring in part and in the result):

As for the majority's second holding concerning erroneous admission of testimony as to the uncharged sexual assault on DR, I disagree in part. Some reason was given

by the military judge for admission of this testimony, namely to show appellant's modus operandi when he was sexually rejected. Moreover, the challenged evidence was minimally relevant for this purpose. *See* Mil.R.Evid. 401 and 402, Manual for Courts–Martial, United States, 1984. No abuse of discretion under Mil.R.Evid. 404(b) occurred in such a context. *See United States v. Spata*, 34 MJ 284, 286 (CMA 1992). However, the military judge's decision to admit this single-incident evidence violated Mil.R.Evid. 403, since it clearly did not possess great probative value on this point. *Cf. United States v. Watkins*, 21 MJ 224 (CMA) (seven prior incidents evidenced), *cert. denied*, 476 U.S. 1108, 106 S.Ct. 1956, 90 L.Ed.2d 364 (1986).

In any event, I agree that any error in admission of this evidence was harmless in view of the other evidence in this case. Art. 59(a), Uniform Code of Military Justice, 10 USC § 859(a).