# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

_____

**No. ACM 40050**

_____

**UNITED STATES**
*Appellee*

**v.**

**Jared J. BAIRD**
Senior Airman (E-4), U.S. Air Force, *Appellant*

_____

Appeal from the United States Air Force Trial Judiciary

Decided 9 September 2022

_____

*Military Judge:* Charles G. Warren.

*Sentence:* Sentence adjudged 13 November 2020 by GCM convened at McConnell Air Force Base, Kansas. Sentence entered by military judge on 24 February 2021: Bad-conduct discharge, confinement for 4 months, reduction to E-1, and a reprimand.

*For Appellant:* Major Stuart J. Anderson, USAF.

*For Appellee:* Major Brian E. Flanagan, USAF; Mary Ellen Payne, Esquire.

Before POSCH, RICHARDSON, and MERRIAM, *Appellate Military Judges*.

Judge MERRIAM delivered the opinion of the court, in which Senior Judge POSCH and Judge RICHARDSON joined.

_____

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

_____

MERRIAM, Judge:

A general court-martial composed of a military judge sitting alone convicted Appellant, contrary to his pleas, of one specification of aggravated assault by force likely to produce death or grievous bodily harm upon a child under the age of 16 years, in violation of Article 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 928.[1] The adjudged sentence was a bad-conduct discharge, confinement for four months, reduction to the grade of E-1, and a reprimand.

Appellant requested clemency, but the convening authority approved the sentence as adjudged. The convening authority also denied Appellant's request to defer reduction in grade and to waive automatic forfeitures. The military judge entered judgment on 24 February 2021.

Appellant raises three issues on appeal: (1) whether the military judge abused his discretion in denying a motion in limine to preclude the Government from offering evidence under Mil. R. Evid. 404(b); (2) whether Appellant's conviction for aggravated assault by force likely to produce death or grievous bodily harm is legally and factually insufficient; and (3) whether Appellant's conviction for aggravated assault by force likely to produce death or grievous bodily harm is legally and factually insufficient, asserting that "civilian investigations cleared him of wrongdoing."[2] We also address an issue not raised by Appellant: whether he was prejudiced by trial defense counsel's erroneous statement of the law when submitting clemency matters on Appellant's behalf. Finding no error that materially prejudiced a substantial right of Appellant, and finding the conviction legally and factually sufficient, we affirm the findings and sentence.

## I. BACKGROUND

Appellant's daughter CB was born in November 2017 to Appellant and Appellant's wife, AB. For the first four months after CB's birth, AB, an active-duty Airman herself, took maternity and personal leave to be her daughter's primary caregiver. During this time, Appellant usually worked midnight shifts. In March 2018, after taking about four months of leave, AB returned to

---

[1] All references in this opinion to the UCMJ's punitive articles are to the *Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*). The charge and specifications were referred to trial after 1 January 2019; accordingly, all other references to the UCMJ, Rules for Courts-Martial (R.C.M.), and Military Rules of Evidence (Mil. R. Evid.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] Appellant personally raises the third issue pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

work duties, which occurred mostly during the day. AB was beginning the process of separating from active-duty and was primarily tasked with completing out-processing requirements. Her duties involved a combination of full-time and part-time work. Upon AB's return to work, Appellant took on a larger share of childcare responsibilities, including hours-long periods during the day when he was alone with his daughter. At about this time, injuries to CB's body began appearing, and she was taken to the Emergency Room (ER) for injuries twice in less than one month.

On 15 March 2018, AB spotted several small round bruises on CB's head that were "perfectly placed" and "just didn't look normal." AB brought the bruises to Appellant's attention and they took CB to the ER. At the time, AB wondered if it was possible that the bruises were from her fingertips as she held CB's head to her chest. At trial, a pediatrician testified that normal handling of a baby would not cause such bruising, and an excessive amount of force would be required for cradling a baby's head to cause bruising, so AB's theory did "not fit what happened." The pediatrician also testified that the cluster of bruises on different planes of the head was concerning because they suggested not a single, one-time blunt-force trauma, but rather multiple points of contact caused the bruises. A computed tomography (CT) scan conducted at the hospital revealed no injury, and CB was released to her parents.

On 11 April 2018, Appellant returned home from work at approximately 0800. Around 1030, AB handed CB to Appellant and left to accomplish some out-processing tasks. Approximately two hours later, Appellant telephoned AB and told her their daughter was acting fussy and he was having difficulty feeding her. He asked AB when she would be returning home. AB testified she could hear CB crying in the background during the call, but Appellant did not sound "mad" or "stressed out."

AB returned home from work sometime between 1300 and 1500.[3] When AB returned home, Appellant and CB were asleep on a couch in the living room, with Appellant lying on his back and CB lying face down on Appellant's chest. AB took CB from Appellant's chest and Appellant retired to his bedroom where he slept until that evening. AB testified that at this time, CB was fussy, but otherwise "acting normal."

---

[3] On direct examination by the Government, AB did not remember when she returned home, but during cross-examination she stated she returned home at 1300. Additionally, as explained later, a noncommissioned officer testified she received a text message from AB at 1300, asking her to secure AB's military identification card, which AB had left behind when she left work early. AB apparently told medical providers that evening that she first observed symptoms after she returned home around 1500.

AB testified that it was not until later in the day that she "noticed things." Specifically, AB testified that CB had new bruising on her head that had not been there when AB left for work that morning. AB also noticed CB was using only her left arm to grab and move her toys, while her right arm was limp, and that whenever AB moved CB's right arm, CB grimaced. Because CB had been asleep when AB arrived home from work, AB wondered if perhaps CB's arm had fallen asleep or if perhaps Appellant had "squashed her on the couch, like rolled over on her."

At approximately 1530, AB texted a close friend who was an experienced mother. AB told her friend that CB was upset and constipated but did not mention CB's arm at that time. Awhile later, AB texted a picture of CB to her friend, seeking advice because CB was not using her arm. Her friend recommended waiting an hour to see if CB began using her arm again, and if not, to call CB's pediatrician. AB then took CB on some errands, including to the grocery store to purchase prunes to address AB's concern that CB might have been fussy because she was constipated. Then they traveled to the visitor center at the base main gate, where AB met an active-duty friend and noncommissioned officer (NCO) who gave AB her military identification card that AB had left at work. During this interaction, which took place somewhere between 1600 and 1700, the NCO observed CB, who was not "crying" or "fussing" at the time. However, AB told the NCO that something was wrong with CB's arm and CB had been acting fussy that day. Upon leaving the visitor center, AB phoned her pediatrician and an after-hours nurse advised AB to take CB to the ER. AB took CB home, woke up Appellant, and told him that something was wrong with CB's arm. AB testified that Appellant seemed surprised, shocked, and immediately concerned. As she had when she noticed the small bruises on CB's head a month earlier, AB alerted Appellant to the injury and they took CB to the ER.

At the ER, x-rays revealed three bone fractures on CB's right arm. At trial, three medical experts—a pediatrician specializing in child abuse, a pediatric radiologist, and a general pediatrician—testified that the arm fractures were not the result of an accident. Two experts testified the fractures were likely the result of a "grab and twist" or "pull and twist" motion and that the fractures could have occurred at the same time.

During the afternoon and into the evening of 11 April 2018, AB used her phone to search the Internet to research her concerns about CB's fussy behavior and then CB's arm. AB first searched for information about possible gastrointestinal issues. After noticing CB was not moving her arm, AB's search queries included "four-month-old infant isn't moving arm" and "nursemaids elbow." And later while at the hospital after learning CB's arm was fractured, AB's queries included "how long does it take for a baby to heal a fracture," "4

month old fractured arm and I don't know how," "infant bone fractures," and "how do they test for cancer."

Because an infant's unexplained fractures may indicate child abuse, hospital personnel conducted a comprehensive evaluation of CB's body. From x-rays taken during this and a subsequent evaluation, a fracture of the scapula in CB's left shoulder and a possible bone fracture in CB's left leg were discovered. The pediatric radiologist testified the type of left scapula fracture is "largely seen in abused infants" and was likely the result of blunt trauma. The expert further testified that the timing of the shoulder fracture could not be precisely determined, that it could have occurred seven days before the arm fractures, and that it definitely did not occur the same day as the arm fractures, because it had started healing. The expert opined that the scapula fracture may have occurred up to two weeks before the x-rays were taken on 11 April 2018. The pediatric radiologist testified that he suspected what he observed in the left leg was a buckle fracture, but he could not definitively rule out a non-injury bone abnormality. The pediatric radiologist further testified that, given the different fractures, "[Y]ou really can't have a better pattern that is suspicious for non-accidental trauma or child abuse."

Appellant was charged with three specifications of aggravated assault in which grievous bodily harm is intentionally inflicted upon a child under the age of 16 years. One specification was for the fractures of CB's arm, one for the fracture of CB's leg, and one for the bruised scalp.[4] For the arm injury, the military judge found Appellant guilty of the lesser included offense of assault by force likely to produce death or grievous bodily harm committed upon a child under the age of 16 years; the military judge acquitted Appellant of the other two specifications.

## II. DISCUSSION

### A. Admissibility of Uncharged Acts under Mil. R. Evid. 404(b)

Appellant challenges the military judge's ruling denying his motion to exclude a text conversation between Appellant and AB that occurred on 27 February 2018, about six weeks before CB's broken arm. Specifically, trial defense counsel objected to admission of the following exchange ("Text Exchange"):

> Appellant: I'm sorry I got mad at you. I wasn't mad at you she was just stressing me out and I never don't [sic] want to get mad

---

[4] Over defense objection, the military judge admitted evidence of the scapula fracture as uncharged misconduct under Mil. R. Evid. 404(b) for the limited purpose of demonstrating absence of mistake in committing the charged acts of abuse.

at her. Sorry if you think I'm a bad dad but I'm doing the best I can. I didn't mean what I said and I'm sorry.

AB: You're not a bad dad. You just made me mad when you said never to give her to you again.

Appellant: I didn't mean that. I was just mad but I wouldn't ever take out my stress on her. But I shouldn't take it out on you either.

### 1. Additional Background

At trial, based on testimony and available evidence, the Government and the Defense acknowledged that CB's injuries were not accidental and that only two parties—Appellant and AB—could have caused the injuries. As demonstrated throughout its opening statement, introduction of evidence, and closing argument, the Government's theory of the case was that once AB's maternity and personal leave ended and she returned to work, and Appellant took on increased responsibility for caring for CB, Appellant became increasingly frustrated with CB and increasingly physically violent with her.

Before trial, Appellant's trial defense counsel submitted a motion in limine, objecting to the introduction of the Text Exchange. The military judge conducted a pretrial hearing on the matter during which the Defense argued that the Text Exchange was improper evidence under Mil. R. Evid. 404(b) because it failed the test for the admissibility of other acts established by our superior court, then the Court of Military Appeals, in *United States v. Reynolds*, 29 M.J. 105 (C.M.A. 1989). During this argument, trial defense counsel stated "in the alternative, should you find this does satisfy the 404(b) test . . . we would make a [Mil. R. Evid.] 106 objection." (Omission in original). Defense explained that if the judge ruled the Text Exchange admissible, additional text messages between Appellant and AB should also be admitted under the "rule of completeness" codified in Mil. R. Evid. 106: "Your Honor, [D]efense's position is, we have no problem with the entirety of [the text conversations between Appellant and AB] going in, including what trial counsel has offered, but we want the entire context coming in if . . . if theirs is to be admitted." (Omission in original).

In responding to the Defense's argument, trial counsel initially noted the proffered evidence might not implicate Mil. R. Evid. 404(b) at all, but trial counsel's argument focused on admissibility under Mil. R. Evid. 404(b). When the military judge asked the "category" for admitting the evidence under Mil. R. Evid. 404(b), trial counsel suggested three bases: (1) intent; (2) lack of mistake; and (3) a basis that trial counsel argued "falls outside of those specific labels, but goes to this idea that it's not in conformity therewith, but the theory of being." Trial counsel argued the Text Exchange was relevant because on 28

February 2018 when Appellant became frustrated with CB, he had an "outlet"—AB—to deal with his emotions, but on 11 April 2018 when Appellant became frustrated with CB, he did not have the "outlet" he typically used because AB was at work. Trial counsel agreed with the following summary of this argument offered by the military judge: "All right. So you're offering it for evidence of the cumulative impact of the frustration on [Appellant], and that when [t]he outlet was no longer there, that he redirected his frustration directly at [CB]?"

Before trial, the military judge denied the Defense's motion and ruled that the Text Exchange would be admissible under Mil. R. Evid. 404(b). In so ruling, the military judge explicitly allowed that he would consider motions for reconsideration "later in the case [that] the [D]efense deems prudent based upon any new facts or new case law that the [D]efense may want to point the court to." The military judge also indicated the additional text messages requested by Defense under Mil. R. Evid. 106 would be admitted if the Text Exchange was admitted. During the Government's case in chief, trial counsel moved for admission of the Text Exchange. The military judge asked, "Defense counsel, do you have any objections to Prosecution Exhibit 1 for identification?" and trial defense counsel responded, "No objection your honor."

**2. Law**

Mil. R. Evid. 404(b) provides that evidence of a crime, wrong, or other act by a person is not admissible as evidence of the person's character to show the person acted in conformity with that character on a particular occasion, and cannot be used to show predisposition toward crime or criminal character. However, such evidence may be admissible for another purpose, including to show motive, intent, plan, absence of mistake, or lack of accident. Mil. R. Evid. 404(b)(2); *United States v. Staton*, 69 M.J. 228, 230 (C.A.A.F. 2010) (citation and footnote omitted). The list of potential purposes in Mil. R. Evid. 404(b)(2) "is illustrative, not exhaustive." *United States v. Ferguson*, 28 M.J. 104, 108 (C.M.A. 1989). Mil. R. Evid. 404(b) is a "rule of inclusion rather than a rule of exclusion." *United States v. Browning*, 54 M.J. 1, 6 (C.A.A.F. 2000).

We apply a three-part test to review the admissibility of evidence under Mil. R. Evid. 404(b): (1) Does the evidence reasonably support a finding by the factfinder that Appellant committed other crimes, wrongs, or acts? (2) Does the evidence of the other act make a fact of consequence to the instant offense more or less probable? and (3) Is the probative value of the evidence of the other act substantially outweighed by the danger of unfair prejudice under Mil. R. Evid. 403? *Reynolds*, 29 M.J. at 109 (citations omitted). "If the evidence fails to meet any one of these three standards, it is inadmissible." *Id.*

We review a military judge's decision to admit evidence under Mil. R. Evid. 404(b) for an abuse of discretion. *United States v. Hyppolite*, 79 M.J. 161, 164 (C.A.A.F. 2019) (citation omitted). "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008) (per curiam)). "To reverse for an abuse of discretion involves far more than a difference in . . . opinion . . . . The challenged action must . . . be found to be arbitrary, fanciful, clearly unreasonable, or clearly erroneous in order to be invalidated on appeal." *Hyppolite*, 79 M.J. at 166 (omissions in original) (internal quotation marks omitted) (quoting *United States v. Johnson*, 49 M.J. 467, 473 (C.A.A.F. 1998)).

"A party may claim error in a ruling to admit or exclude evidence only if the error materially prejudices a substantial right of the party and: (1) if the ruling admits evidence, a party, on the record: (A) timely objects or moves to strike; and (B) states the specific ground, unless it was apparent from the context . . . ." Mil. R. Evid. 103(a). However, "[o]nce the military judge rules definitively on the record admitting or excluding the evidence, either before or at trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal." Mil. R. Evid. 103(b).

The elements of the offenses with which Appellant was charged, aggravated assault in which grievous bodily harm is intentionally inflicted, were: (1) That the accused assaulted a certain person; (2) That grievous bodily harm was thereby inflicted upon such a person; (3) That the grievous bodily harm was done with unlawful force or violence; and (4) That the accused, at the time, had the specific intent to inflict the grievous bodily harm. *See Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*), pt. IV, ¶ 54.b.(4)(b).

### 3. Analysis

#### a. Waiver

The Government contends trial defense counsel waived the Mil. R. Evid. 404(b) issue when stating "[n]o objection" in response to trial counsel's offer of the exhibit containing the Text Exchange. We disagree. Defense counsel submitted a written motion to exclude the evidence, argued the motion during an Article 39(a), UCMJ, 10 U.S.C. § 839(a), session before trial, and argued "*in the alternative,* should you find this does satisfy the 404(b) test," (emphasis added), more text message exchanges should be admitted to provide context. Trial defense counsel reiterated that the Defense had "no problem with the entirety of [the text conversations between Appellant and AB] going in . . . *if* theirs is to be admitted." (Emphasis added) (omission in original). The military

judge subsequently ruled against the Defense, finding that the contested evidence was admissible under Mil. R. Evid. 404(b). We conclude that when the Prosecution offered the evidence at trial, trial defense counsel's "no objection" was merely a recognition that the military judge had already considered and overruled the Defense's objection, and they had no other objection to the evidence. Pursuant to Mil. R. Evid. 103(b), trial defense counsel was not required to re-raise the same objection to preserve the issue.

### b. Admissibility of the Text Exchange Under Mil. R. Evid. 404(b)

The military judge's ruling that the Text Exchange was admissible suggested several bases for admission under Mil. R. Evid. 404(b): intent, motive, and absence of mistake. In evaluating the probative value of the evidence, the military judge explained that the Text Exchange represented "a self-expressed significant level of frustration with CB by [Appellant], related to his difficulties dealing with her crying, with similar expressions occurring on 27 Feb[ruary] and 11 Apr[il] 2018." The military judge further explained the Text Exchange's probative value was "significant" because it showed a "recent history of frustration with the behavior of CB" that provided circumstantial evidence that Appellant had the requisite intent to commit the charged offenses. The military judge also found the Text Exchange was "crucial contextual information" for the Government, given the Government's evidentiary burden to prove specific intent to cause bodily harm.

In his written ruling issued after findings, the military judge further explained that he

> admitted the evidence for the purpose of circumstantial evidence as to [Appellant's] frustration levels with CB and his role as a new parent within a proximate timeframe from the charged misconduct . . . . The Court considered [the Text Exchange] for the limited purpose of whether [Appellant's] actions (which the charged misconduct alleged resulted in the injuries to CB) were motivated by this prior frustration and whether those physical acts which ultimately resulted in the alleged injuries to CB were the results of a mistake or accident.

During trial, the Government made reference to the Text Exchange twice, both during findings argument:

> And then, sir, we look again to the surrounding circumstances and the evidence. The [G]overnment has put forth the evidence that we have [Appellant] alone with a crying, screaming baby. We have the text messages or . . . excuse me, sir . . . the phone call, showing that he recognizes that stress and he's trying to urge his wife to get home that day, to come help him. And then

we see [the Text Exchange], when he's talking about needing an outlet, when he has the stress of that baby in front of him. And in that instance, he's able to use [AB] as that outlet. And so looking at the surrounding circumstances, we see all of those things informing the mindset of [Appellant] in the moment, and it is to intentionally inflict and achieve the result that we see.

. . . .

And finally, sir, the last piece that we have to look at is where we started this case a couple of days ago, and it's [the Text Exchange]. And we see exactly that in one of these instances, where [AB] even testified about, I think this was one of those times where [Appellant] got so frustrated he had to put the baby down. And we see him there talking about the frustration that he has at this child, talking about how this child has gotten [him] frustrated, and how [AB] is his outlet for that. That she is his outlet when that happens. He says the thing that should have to go without saying, "I don't want to take my frustration out on my five-month-old baby." That's a consideration at that moment in time. "Good thing you were here, [AB], because I don't want to take the frustration out on the five-month-old baby." The thing that should go without saying. And we know, sir, what happened on 11 April of 2018, is that that outlet wasn't there. [AB] wasn't there. She was at work. And we see in the evidence here, we see in the x-rays, we see in the medical evidence, we see in the testimony from experts, what happened when she wasn't.

Mil. R. Evid. 404(b) permits admission of evidence of a "crime, wrong, or other act." As trial counsel suggested when arguing against Defense's motion, and as the Government again notes on appeal, it is not entirely clear that Mil. R. Evid. 404(b) is the correct vehicle for assessing admissibility of the Text Exchange. This is because it is not entirely clear what "other act" the Text Exchange raises.

Our superior court has held that mere statements can be "other acts" for purposes of Mil. R. Evid. 404(b) analysis, even when the charged offense is a physical act, not a "statement." *See, e.g.*, *United States v. Franklin*, 35 M.J. 311, 318 (C.M.A. 1992) (finding appellant's prior statement, "[D]id you ever wonder what it would be like to kill a bitch," was admissible under Mil. R. Evid. 404(b) in prosecution for murder because "the statement was relevant to establish appellant's intent to kill and was not unduly prejudicial"). In this case, the "acts" implicated by the Text Exchange were Appellant's communication of his frustration with CB and apology to his wife. Relying on our superior court's

holding in *Franklin, id.* at 317, that a statement providing evidence of an accused's state of mind can be considered an "act," we analyze the admissibility of the Text Exchange through the lens of Mil. R. Evid. 404(b),[5] using the three-part test articulated in *Reynolds*, 29 M.J. at 109.

The military judge concluded the first prong of the "*Reynolds* test"—whether the evidence reasonably supports a finding by the factfinder that Appellant engaged in other acts—was satisfied because the parties agreed that a reasonable factfinder could conclude by preponderance of the evidence that the underlying acts occurred. That is, the parties agreed that the Text Exchange was authentic and reflected the communications between the parties. Moreover, AB testified as to the authenticity of the Text Exchange. At first, trial defense counsel expressed that it was unclear what "other act" the Text Exchange implicated, but trial defense counsel ultimately conceded "this likely survives the low threshold of the first prong."[6] We find the military judge did not abuse his discretion in applying the first *Reynolds* prong when he determined by a preponderance of the evidence that Appellant communicated his frustration with CB to his wife, AB.

Applying the second *Reynolds* prong—whether evidence of the other acts makes a fact of consequence to the instant offense more or less probable—the military judge found that the evidence was being offered for recognized non-propensity purposes, specifically: intent, motive, and absence of mistake. The military judge determined that a "fact of consequence" in the case was the "intent/absence of mistake for [Appellant] to engage in the physical assaults." Though the military judge's analysis of this prong on the record and in his written ruling was somewhat sparse, he stated he admitted the evidence as "circumstantial evidence" of the Appellant's "frustration levels with CB" and "for the limited purpose" of whether Appellant's actions might have been motivated by his prior frustration with CB "and whether those physical acts that ultimately resulted in the alleged injuries to CB were the results of a mistake or accident." The military judge noted the similarity between the frustration expressed in the Text Exchange and the circumstances of the day when CB's arm was broken, meeting the requirement that he consider "whether Appellant's state of mind in the commission of the charged and uncharged acts was

---

[5] Ultimately, whether admission of the Text Exchange required a Mil. R. Evid. 404(b) analysis does not alter our conclusion that the military judge did not abuse his discretion in admitting it. As discussed later, trial defense counsel conceded the first *Reynolds* prong, and the remaining two prongs that were preserved by the Defense's Mil. R. Evid. 404(b) objection apply to *all* admissions of evidence. *See United States v. Hays*, 62 M.J. 158, 164 (C.A.A.F. 2005) (noting "two of the three prongs involve relevance and undue prejudice under [Mil. R. Evid.] 401 and [Mil. R. Evid.] 403," respectively).

[6] On appeal, Appellant again concedes the first *Reynolds* prong is met.

sufficiently similar to make the evidence of the prior acts relevant on the intent element of the charged offenses." *United States v. McDonald*, 59 M.J. 426, 430 (C.A.A.F. 2004).

At the time the Text Exchange was admitted, Appellant was charged with an offense under Article 128(b)(1), UCMJ, 10 U.S.C. § 928(b)(1), that included the specific intent to inflict grievous bodily harm. Thus, Appellant's state of mind upon commission of the offense was a "fact of consequence." The fact that Appellant was frustrated by CB during the charged timeframe, and several weeks prior to the discovery of CB's bone fracture injuries, made it more likely that Appellant intentionally inflicted harm on CB. As the military judge noted, Appellant's frustration with CB also demonstrated a possible motive to harm CB and that CB's injuries were not the product of a mistake. The self-expressed frustration with CB during the charged timeframe contained in the Text Exchange made facts of consequence to the charged offenses more probable. *See Reynolds*, 29 M.J. at 109 (citation omitted). We find the military judge did not abuse his discretion in concluding the second prong of the *Reynolds* test was met.

Applying the third *Reynolds* prong, the military judge determined the probative value of the circumstantial evidence of a fact of consequence—that Appellant may have had the requisite intent to commit the charged physical acts—was not substantially outweighed by the danger of unfair prejudice in admission of the evidence, a danger the military judge acknowledged might exist.

In contrast with his analysis of *Reynolds'* second prong, the military judge's analysis of the third prong was extensive. He considered the proof of the prior act (finding it uncontested), probative weight of the prior act (finding it significant), the potential to present less prejudicial evidence (finding that doing so would deprive the factfinder of crucial context), possible distraction of the factfinder (finding it negligible because Appellant's intent was a crucial aspect of the case, not a distraction), the time needed to prove the prior conduct (finding it negligible, as the Text Exchange appeared in a brief document whose authenticity was unchallenged), the temporal proximity of the event (finding it proximate—within seven weeks of the charged misconduct), the frequency of the acts (finding it episodic, not persistent), the presence of intervening circumstances (finding none), and the relationship between the parties (noting Appellant's level of frustration with CB and Appellant's communication of his frustrations to AB, CB's mother). The military judge also noted any danger of unfair prejudice was limited by two factors. First, the military judge agreed to the defense request to admit additional text messages that tended to show Appellant was sometimes a calming influence on AB during her new parent frustrations. Second, the military judge intended to provide specific instruction to

the members that propensity evidence is impermissible.[7] On this point, in his written ruling completed after trial, the military judge explicitly acknowledged his awareness of "the prohibition in [Mil. R. Evid.] 404(a) against the use of propensity evidence against [Appellant]" and explicitly stated he considered the Text Exchange solely for a non-propensity purpose.[8]

Given the ubiquity of parental frustration with crying infants, and the ambiguity of the meaning of Appellant's emotional plea to "never give her to me again," the probative value of the Text Exchange may not have been extremely high. However, the universality of parental frustration with crying infants also lessened the danger of unfair prejudice. As to the third *Reynolds* prong, we find the military judge properly applied the Mil. R. Evid. 403 balancing test and that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. *See Reynolds*, 29 M.J. at 109 (citation omitted).

In evaluating the admissibility of the Text Exchange under *Reynolds*, the military judge's findings of fact upon which he based his ruling were supported by the evidence, he used correct legal principles, and his application of the correct legal principles to the facts was not clearly unreasonable. Accordingly, we find the military judge did not abuse his discretion in denying Appellant's motion and admitting the Text Exchange. *Ellis*, 68 M.J. at 344 (citations omitted).

## B. Legal and Factual Sufficiency

Contrary to Appellant's pleas, the military judge found Appellant guilty of one specification of aggravated assault by force likely to produce death or grievous bodily harm upon a child under the age of 16 years, in violation of Article 128, UCMJ. Appellant contends that the evidence supporting his conviction is legally and factually insufficient. We disagree.

### 1. Law

A Court of Criminal Appeals may affirm only such findings of guilty as it "finds correct in law and fact and determines, on the basis of the entire record, should be approved." Article 66(d), UCMJ, 10 U.S.C. § 866(d). "Article 66[ ] requires the Courts of Criminal Appeals to conduct a de novo review of legal and factual sufficiency of the case." *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (emphasis and citation omitted). Our assessment is limited

---

[7] Forum selection had not yet occurred when the military judge ruled on Defense's motion.

[8] While discussing propensity evidence in the context of a separate defense objection during trial, the military judge also commented that in a judge-alone context, the "danger of unfair prejudice of drawing a propensity inference" was "precipitously lower, if not nonexistent . . . . I do not consider the evidence that way. Flat out. The law does not permit me to nor would I want to."

to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citation omitted). In resolving questions of legal sufficiency, we are bound to draw "'every reasonable inference from the evidence of record in favor of the prosecution.'" *Robinson*, 77 M.J. at 298 (C.A.A.F. 2018) (*quoting United States v. Plant*, 74 M.J. 297, 301 (C.A.A.F. 2015)); *see also United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399). To conclude the evidence is factually sufficient "does not mean that the evidence must be free of conflict." *United States v. Galchick*, 52 M.J. 815, 818 (A.F. Ct. Crim. App. 2000) (citation omitted).

Appellant was convicted of aggravated assault by force likely to produce death or grievous bodily harm upon a child under the age of 16 years, a lesser included offense of the charged offense. The elements of this offense in effect at the time of the offense were: (1) that the accused attempted to do, offered to do, or did bodily harm to a certain person; (2) that the accused did so with a certain force; (3) that the bodily harm was done with unlawful force or violence; (4) that the force was used in a manner likely to produce death or grievous bodily harm; and (5) that the person was a child under the age of 16 years. *See* 2016 *MCM*, pt. IV, ¶ 54.b.(4)(a). "An 'assault' is an attempt or offer with unlawful force or violence to another . . . done without legal justification or excuse and without the lawful consent of the person affected. 'Bodily harm' means any offensive touching of another, however slight." 2016 *MCM*, pt. IV, ¶ 54.c.(1)(a). "Other means or force" "may include any means or instrumentality not normally considered a weapon. When the natural and probable consequence of a particular use of any means or force would be death or grievous bodily harm,

it may be inferred that the means or force is 'likely' to produce that result." 2016 *MCM*, pt. IV, ¶ 54.c.(4)(a)(ii). "'Grievous bodily harm' means serious bodily injury. It does not include minor injuries, such as a black eye or a bloody nose, but does include fractured or dislocated bones . . . ." 2016 *MCM*, pt. IV, ¶ 54.c.(4)(a)(iii).

**2. Analysis**

The testimony of medical experts and medical records established that CB, a non-mobile four-month-old infant, suffered the grievous bodily injury of multiple fractures to bones in her right arm. These experts testified that the fractures were not the result of an accident, but instead were caused by someone pulling and twisting her arm with enough force to break the bones in her right arm in three places. Evidence admitted at trial demonstrated that only CB's parents—Appellant and AB—had opportunity to inflict these injuries. There was no evidence indicating any other person lived in their home, or that CB attended day care, or was cared for by anyone other than her parents after December 2017. CB was with one or both of her parents the entire day on which the arm fractures occurred. On appeal, Appellant acknowledges that "either [AB or Appellant] had the opportunity to commit the assault on CB." Likewise, at trial, the Defense's main theory was not that CB's injury was accidental, or even that CB was not the victim of an aggravated assault, but rather that Appellant was not the offender. Trial defense counsel offered the military judge only one explanation of how CB's arm was broken: CB's mother did it. During findings argument, trial defense counsel detailed the theory, arguing that on the day in question it was a "real possibility" AB came home from work frustrated, became more upset because CB, who had been sleeping, started crying again, and due to these stressors, AB "snatche[d] her child by her arm, breaking it."

Under a grant of immunity, AB testified that she did not cause CB's injuries. In denying that she caused CB's broken arm, AB attempted to portray Appellant in the best possible light and to not cast blame on him,[9] adding some credibility to her own denial of responsibility. AB's actions on the day CB's arm was broken corroborate her testimony that she was not the offender. AB had

---

[9] AB testified she wanted Appellant at home to help her care for CB. She characterized him as "clumsy, [but] not hateful." AB further testified that Appellant, after caring for CB for only two hours, called to ask her when she was coming home. AB heard her daughter crying in the background, but Appellant was not "mad" or "stressed out." She also resisted trial counsel's attempts to characterize herself as the sole caregiver while she was on maternity leave and to characterize Appellant as needing her to remind him to put CB down and walk away when he was frustrated. AB candidly admitted being worried she had caused the round bruises on CB's head a month before the arm fracture.

not noticed any issues with CB's arm or bruises on her head when she left for work at around 1030 that morning. AB's Internet search history and her concerned text and phone conversations with friends that afternoon further demonstrated AB initially did not realize something was wrong with CB's arm, and that when she did realize something was wrong with CB's arm, she did not know what was wrong or what the cause was. A rational trier of fact could conclude that this is because, unlike Appellant, AB did not know what had happened to CB's arm.

After viewing the evidence in the light most favorable to the Government, a rational trier of fact could have found Appellant guilty beyond a reasonable doubt of every element of the offense of aggravated assault by force likely to produce death or grievous bodily harm upon a child under the age of 16. *Robinson*, 77 M.J. at 297–98. Moreover, having weighed the evidence in the record and made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. Thus, we find Appellant's conviction is legally and factually sufficient.[10]

**C. Clemency Submission Error**

We turn now to a potential post-trial error not asserted by Appellant, but that raises the issue of whether Appellant was prejudiced by trial defense counsel's erroneous statement of law when submitting clemency matters.

**1. Additional Background**

In her clemency request on Appellant's behalf, trial defense counsel stated, "Per Rule for Court[s]-Martial [(R.C.M.)] 1109, it is the Defense's understanding that [Appellant] cannot receive convening authority action on his adjudged sentence. However, he respectfully requests any relief that may be available to him in accordance with the applicable Rules for Court[s]-Martial and the UCMJ." Later in the same clemency request, trial defense counsel reiterated, "[T]he [D]efense respectfully requests that any relief that may be available be

---

[10] Appellant also contends, as the third issue he raises on appeal, that his conviction is rendered legally and factually insufficient because a civilian investigation conducted by the Kansas Department for Children and Families "cleared him of wrongdoing." This court cannot consider information not introduced at trial in determining the factual and legal sufficiency of Appellant's conviction. *See United States v. Reed*, 54 M.J. 37, 43–44 (C.A.A.F. 2000) (citations omitted); *United States v. Batson*, No. ACM 39637, 2021 CCA LEXIS 74, at *37–38 (A.F. Ct. Crim. App. Feb. 18, 2021) (unpub. op.). Moreover, the court's responsibility under Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a) and 866(d), to determine if the findings are legally and factually sufficient does not countenance consideration of the outcome of an investigation conducted by a civil agency for different purposes, relying on different—and possibly incomplete—evidence.

afforded [Appellant]." In an addendum to the clemency request submitted a few weeks later, trial defense counsel requested on Appellant's behalf that the convening authority defer the adjudged reduction in grade and waive automatic forfeitures, both for the benefit of Appellant's two-year-old daughter, CB, the victim of Appellant's offense. In this clemency addendum, trial defense counsel did not address her prior assertion that Appellant could "not receive convening authority action on his adjudged sentence."

Prior to coming to his decision on action the convening authority consulted with his staff judge advocate and considered matters Appellant submitted under R.C.M. 1106. The convening authority then approved the sentence as adjudged and denied Appellant's request to defer the grade reduction and to waive automatic forfeitures.

### 2. Law

R.C.M. 1109 provides that when, as in this case, the accused is convicted by special or general court-martial and the sentence of the court-martial includes a bad-conduct discharge, the convening authority's power to act on sentence is limited. However, in such cases, the convening authority may still reduce, commute, or suspend, in whole or in part, the confinement portion of a sentence if the confinement portion of the sentence is six months or less; a reprimand; forfeiture of pay or allowances; a fine; reduction in pay grade; restriction to specified limits; and hard labor without confinement. R.C.M. 1109(c)(5).

Courts have assessed trial defense counsel's misstatements of law in clemency requests through the dual lenses of post-trial processing error and ineffective assistance of counsel. *See, e.g., United States v. Addison*, 75 M.J. 405 (C.A.A.F. 2016) (mem.) (returning record to The Judge Advocate General because the staff judge advocate recommendation (SJAR) addendum failed to correct legal error in clemency submission); *United States v. Zegarrundo*, 77 M.J. 612, 614 (A.F. Ct. Crim. App. 2018) ("The combination of trial defense counsel's erroneous statement that the [convening authority] could not disapprove confinement; the corresponding clemency request for disapproval of the reduction in rank and forfeiture of pay instead of confinement; and the staff judge advocate's failure to correct Defense's erroneous statement resulted in plain error and constitutes a colorable showing of possible prejudice to Appellant in light of *Addison*."); *United States v. Fumega*, No. ACM S32668, 2022 CCA LEXIS 171, *25–30 (A.F. Ct. Crim. App. 21 Mar. 2022) (unpub. op.) (assessing for ineffective assistance of trial defense counsel's submission of waiver of forfeitures request to convening authority when waiver was not authorized by law); *United States v. Hunt*, No. ACM S32513, 2019 CCA LEXIS 439, *16–27 (A.F. Ct. Crim. App. 15 Oct. 2019) (unpub. op.) (assessing trial defense counsel's request for clemency relief that convening authority was not authorized to grant

as ineffective assistance of counsel and as post-trial processing error on part of staff judge advocate); *United States v. Giacinti*, No. 201600190, 2017 CCA LEXIS 44, *5–9 (N.M. Ct. Crim. App. 31 Jan. 2017) (unpub. op.) (evaluating whether trial defense counsel's erroneous statement in clemency request that convening authority no longer had broad authority to grant clemency constituted ineffective assistance of counsel).

Prior to the Military Justice Act of 2016 (MJA),[11] Article 60(e), UCMJ, 10 U.S.C. § 860(e) (2016 *MCM*), required a convening authority to "obtain and consider the written recommendation of his staff judge advocate or legal officer" prior to taking action. The MJA removed the requirement of a written SJAR from Article 60, UCMJ. Subsequently, the President signed Executive Order 13,825, 83 Fed. Reg. 9889, § 5 (8 Mar. 2018), implementing a broad swath of amendments to the Manual for Courts-Martial, including revision of some of the Rules for Courts-Martial addressing post-trial processing. One of those amendments eliminated the requirement in R.C.M. 1106 (2016 *MCM*) for convening authorities to obtain *written* legal advice before taking action. The new R.C.M. 1109(d)(2), which applies to the post-trial processing in this case, requires convening authorities to *consult* with the staff judge advocate or legal advisor "[i]n determining whether to take action, or to decline taking action," but does not require that consultation be reduced to writing. *See United States v. Andersen,* 82 M.J. 543, 548 (A.F. Ct. Crim. App. 19 Apr. 2022).

Cases such as *Addison*, 75 M.J. 405, and *Zegarrundo*, 77 M.J. 612, in which the United States Court of Appeals for the Armed Forces and this court found post-trial error when a staff judge advocate failed to correct a trial defense counsel's misstatement of law in a clemency request, were decided when written SJARs were required. The subsequent elimination of the requirement for written SJARs thus calls into question the continued applicability of those precedents. Addressing a similar post-trial processing issue, our superior court recently held that the elimination of the requirement for a written SJAR rendered inapplicable prior precedent that had imposed a requirement on staff judge advocates to address a military judge's recommendation in the SJAR or addendum. *See Miller*, 82 M.J. at 208 (finding that *United States v. Clear*, 34 M.J. 129, 130 (C.M.A. 1992), in which the Court of Military Appeals found error when a staff judge advocate failed to mention a military judge's recommendation in the SJAR or addendum, was no longer applicable because the MJA and revisions to the R.C.M. had "done away with the staff judge advocate's review of the record and written recommendation").

---

[11] The act was part of the National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, §§ 5001–5542 (23 Dec. 2016).

The right to effective representation extends to post-trial proceedings. *United States v. Lee*, 52 M.J. 51, 53 (C.A.A.F. 1999) (citing *United States v. Cornett*, 47 M.J. 128, 133 (1997)). Our superior court employs the approach announced by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668 (1984): to overcome the presumption that counsel are competent an appellant must show: (1) that his counsel was deficient; and (2) that he was prejudiced by the deficiency. *Id.* at 52 (citing *Strickland*) (additional citation omitted) (evaluating post-trial representation by defense counsel). To overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689–90, "an appellant must 'show specific defects in counsel's performance that were unreasonable under prevailing professional norms.'" *Carter*, 79 M.J. at 480–81 (quoting *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009) (additional internal quotation marks and citation omitted)). In the context of post-trial representation error, our superior court has established that "because of the highly discretionary nature of the convening authority's clemency power, the threshold for showing prejudice is low." *Lee*, 52 M.J. at 53 (citations omitted). There is material prejudice to the substantial rights of an appellant if there is an error and the appellant makes "some colorable showing of possible prejudice." *Id.* (citation omitted).

"An accused's failure to file a post-trial motion within [five days of receiving the convening authority's action] forfeits his or her right to object to the accuracy of the convening authority's decision on an action, absent plain error." *Miller*, 82 M.J. at 207; R.C.M. 1104(b)(2)(B). "To meet this burden in the context of a post-trial recommendation error, whether [the] error is preserved or is otherwise considered under the plain error doctrine, an [appellant] must make some colorable showing of possible prejudice." *Id.* at 208 (additional levels of quotation marks omitted) (citing *United States v. Scalo*, 60 MJ. 435, 436-37 (C.A.A.F. 2005) (citing *Kho*, 54 M.J. at 65)).

**3. Analysis**

In the second sentence of her initial clemency request on Appellant's behalf, trial defense counsel incorrectly informed the convening authority that he did not have authority under R.C.M. 1109 to grant Appellant sentence relief. In fact, the convening authority could have reduced, commuted, or suspended, in whole or in part, any or all of three components of Appellant's sentence: the four months of confinement, the reduction from pay grade E-4 to E-1, and the reprimand. R.C.M. 1109(c)(5). The staff judge advocate did not create an otherwise unrequired written addendum to a non-existent and unrequired SJAR to correct trial defense counsel's error. The convening authority stated in his Decision on Action memorandum that he considered the advice of his staff judge advocate before deciding that clemency was not warranted.

Whether analyzed as post-trial processing error or ineffective assistance of counsel, the burden is on the Appellant to make "some colorable showing of possible prejudice" to establish a basis for relief. *See Miller*, 82 M.J. at 207–08; *Lee*, 52 M.J. at 53. Appellant has asserted neither post-trial processing error nor ineffective assistance of counsel. Unsurprisingly, Appellant has thus offered no argument attempting to show prejudice.

Moreover, the record before us reveals no prejudice. First, the trial defense counsel made multiple concurrent requests that the convening authority grant any relief available. In twice asking the convening authority to deliver any relief that he could, trial defense counsel requested the full scope of relief available and arguably contradicted her erroneous assertion by suggesting to the convening authority that relief was legally available. Also, the convening authority took no action on Appellant's sentence after considering the advice of his staff judge advocate. No evidence has been offered that overcomes our presumption that the staff judge advocate properly performed his duty in correctly advising the convening authority as to his clemency options under R.C.M. 1109. *See United States v. Ashby*, 68 M.J. 108, 130 (C.A.A.F. 2009). Moreover, no evidence has been offered to overcome our presumption that the convening authority chose to grant no relief after considering the advice of his staff judge advocate, as he stated he did and as R.C.M. 1109(d)(2) required *See United States v. Wise*, 20 C.M.R. 188, 194 (C.M.A. 1955) ("[T]he presumption of regularity requires us to presume that [the convening authority] carried out the duties imposed upon him by the Code and the Manual."); *see also United States v. Scott*, 66 M.J. 1, 4 (C.A.A.F. 2008) (applying a "presumption of regularity" to the convening authority's decision). On this record, we have no reason to believe the staff judge advocate failed to correct the trial defense counsel's incorrect legal assertion or that the convening authority was ill-informed of his clemency options under R.C.M. 1109.

Finally, a few weeks after submitting the initial clemency request, trial defense counsel submitted an "Addendum to Submission of Matters" in which Appellant sought deferral of the adjudged reduction in grade and waiver of automatic forfeitures. Appellant sought these accommodations "for the benefit of [Appellant's] two[-]year[-]old daughter," the victim of Appellant's offense, and "in the spirit of not inflicting further harm to [Appellant's] dependents." The convening authority denied even that request in his Decision on Action memorandum, strongly suggesting the convening authority's decision to not grant clemency would have been made irrespective of trial defense counsel's initial misstatement of law.

In short, on this record, there has been no colorable showing of possible prejudice due to trial defense counsel's error. Accordingly, we need not and do

not determine whether trial defense counsel's performance was deficient,[12] or whether the elimination of the requirement for a written SJAR has obviated the requirement previously established by our superior court and this court that staff judge advocates correct in writing trial defense counsel's misstatements of law in clemency requests.

### III. CONCLUSION

The approved findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and the sentence are **AFFIRMED.**

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court

---

[12] "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (quoting *Strickland*, 466 U.S. at 697).